**UNITED STATES of America,**
**Appellant,**

v.

**ALCON LABORATORIES, etc. et al.,**
**Defendants, Appellees.**

**Nos. 80–1188, 80–1357.**

United States Court of Appeals,
First Circuit.

Argued Oct. 10, 1980.
Decided Feb. 24, 1981.

Andrea Limmer, Atty., Dept. of Justice, Washington, D. C., with whom Sanford M. Litvack, Asst. Atty. Gen., Nancy L. Buc, Chief Counsel, Washington, D. C., Forrest T. Patterson, Associate Chief Counsel for Enforcement, Food and Drug Administration, Rockville, Md., and Robert B. Nicholson, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellant.

Thomas O. Henteleff, Washington, D. C., with whom Manuel A. Guzman, McConnell, Valdes, Kelley, Sifre, Griffs & Ruiz-Suria, San Juan, P. R., Glenn E. Davis, and Kleinfeld, Kaplan & Becker, Washington, D. C., were on brief, for defendants, appellees.

Before COFFIN, Chief Judge, PELL * and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The United States appeals from orders of the District Court for the District of Puerto Rico in two seizure actions and a suit for injunctive relief instituted by the Food and Drug Administration (FDA) against Alcon Laboratories, Inc. (Alcon) and one of its products pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301–92 (1976).

Alcon manufactures and markets in suppository dosage a prescription antiemetic drug called "WANS." The drug contains pyrilamine maleate (an antihistamine) and pentobarbital sodium (a barbituate) and comes in three dosage strengths, WANS No. 1, WANS No. 2 and WANS Children. WANS has been used under medical supervision for approximately 25 years, and did not become an object of FDA concern until 1978. To understand what then transpired, it is first useful to review parts of the Federal Food, Drug, and Cosmetic Act.

Section 505 of the Act forbids the introduction into interstate commerce of any "new drug" unless the FDA has approved a New Drug Application (NDA) for the product. 21 U.S.C. § 355. Section 201(p) defines a "new drug" as

"(1) Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof, . . . or

(2) Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions."

21 U.S.C. § 321(p). Obtaining approval of an NDA requires the submission of extensive scientific data and can be slow and expensive, see Note, New Drug Approval: Lannett, The Drug Lag and the NDA System, 11 Rut.-Cam. L.J. 231, 231–34; 248–53 (1980), but Congress imposed these burdens in furtherance of a compelling purpose: "to protect the public against danger to human life arising from use of unsafe and ineffective drugs by assuring that before any drug is marketed it will have been carefully reviewed by FDA experts." Premo Pharmaceutical Laboratories, Inc. v. United States, 629 F.2d 795, 802 (2d Cir. 1980).

A product may be marketable without prior FDA approval for any of three reasons. First, a drug is not a "new drug" if "generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under

* Of the Seventh Circuit, sitting by designation.

the conditions prescribed, recommended, or suggested in the labeling thereof"; if this "expert consensus is founded upon 'substantial evidence'"; *and* if the drug has "been used to a material extent or for a material time under such conditions." 21 U.S.C. § 321(p); *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631–32, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207 (1973); *Premo Pharmaceutical, supra*, 629 F.2d at 801 02. Second, under a "grandfather" clause inserted in the 1938 Act, drugs which prior to June 25, 1938 (the effective date of the Act) were "subject to the Food and Drugs Act of June 30, 1906" and have since undergone no change in composition, labeling or recommendations for use are exempt from Section 505's premarketing approval requirements. 21 U.S.C. § 321(p)(1). And third, another grandfather clause in the Act, added in 1962, relieves from premarketing approval any drug which prior to October 10, 1962 (the effective date of the 1962 amendments) "was commercially used or sold in the United States," was generally recognized as safe by qualified experts, was not covered by an effective new drug application and has undergone no change in composition or labeling. Comment to 21 U.S.C. § 321.

Where the FDA believes that a drug is a "new drug" and is being marketed without approval of an NDA, it is empowered to institute seizure and injunction actions in federal district court to remedy the alleged violation of the Act. 21 U.S.C. §§ 332, 334. The agency may also seek criminal sanctions. 21 U.S.C. § 333.

On March 17, 1978, the FDA sent Alcon a regulatory letter informing it of a report received from the agency's Neurological Drugs Advisory Committee "that children aged 6 months to seven years who were treated for nausea and vomiting with drugs containing pyrilamine maleate and pentobarbital, experienced severe and sometimes fatal reactions." The Committee had concluded, the letter went on, "that there is no evidence of safety and efficacy for drugs containing pyrilamine maleate with or without a barbituate in the treatment of nausea and vomiting." Based on the Committee's report, "and because [the FDA was] unaware of substantial scientific evidence which demonstrates that a combination of these ingredients is generally recognized as safe and effective for the treatment of nausea and vomiting," the FDA advised Alcon that it considered Alcon's marketing of WANS to be in violation of the "new drug" provision of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355. The letter stated that under FDA regulatory policy as formulated in Compliance Policy Guide 7132c.08, *see infra*, WANS had become subject to immediate regulatory action outside the agency's ordinary enforcement priorities "because of new information concerning the safety and efficacy of these drugs." Alcon was told to reply within ten days, and was warned that failure to discontinue marketing WANS would expose the company to seizure and injunction actions.

Alcon responded on April 3, 1978. It claimed that WANS was not a "new drug," objected to the FDA's departure from the ordinary sequence of its enforcement priorities on the basis of an "unsubstantiated, conclusionary indictment of the safety" of the active ingredients in WANS, and requested that it be allowed to "identify and review the data and information upon which the Agency relies, and to make a formal submission to the Agency...." The company also offered to revise the labeling of WANS consistent with the findings of its review. Subsequent to this letter, Alcon, on its own initiative, sent the FDA proposed new labeling for WANS and information supporting the safety and efficacy of the drug. Various company officials met with agency officials on July 10 and 18, 1978 to discuss WANS.

The FDA reviewed the materials provided by Alcon and in a letter of August 4, 1978 reaffirmed its position upon the "new drug" status of WANS: "the data submitted ... contains no adequate scientific data to support the safety and efficacy of

the Wans products." Though the proposed relabeling was felt to be "an improvement," it could not substitute for "scientific evidence to establish that a fixed combination of pyrilamine maleate and pentobarbital sodium is either safe or effective for the treatment of nausea and vomiting." The letter made no reference to Compliance Policy Guide 7132c.08 or to the enforcement priority scheme delineated therein.

Alcon continued to manufacture WANS and on September 21, 1978 the FDA instituted a seizure action in federal district court alleging that the drug was a "new drug" being marketed in violation of Section 505 of the Act, 21 U.S.C. § 355. By court order, a large quantity of WANS suppositories (approximately 453,900) was seized. In its responsive pleadings in the seizure action, Alcon admitted that no approval of a new drug application was in effect for WANS or was being sought. The company nevertheless denied that WANS was being marketed in violation of section 505. Alcon argued that WANS is not subject to the "new drug" requirements of the Act because "it is generally recognized as safe for use under the conditions prescribed, recommended or suggested in its labeling, and it is exempted from the 'efficacy' requirements of the Federal Food, Drug and Cosmetic Act" by the 1962 grandfather clause discussed *supra*. In addition, Alcon contended that the FDA was acting in violation of its pertinent Compliance Policy Guide.

Despite seizure of the suppositories, Alcon continued to manufacture and distribute WANS, thus prompting the FDA, on November 28, 1978, to institute a further action, this time seeking a temporary restraining order, a preliminary injunction and a permanent injunction against continued marketing of WANS without FDA approval. On the next day, November 29, the district court denied the FDA's request for a temporary restraining order, and consolidated the injunctive suit with the earlier seizure action. On December 19, 1978, the district court gave the parties 90 days to complete discovery in the consolidated proceeding and set a trial date of May 7, 1979.

On March 21, 1979, however, Alcon moved the district court to remand to the FDA,

> "with instructions to defer regulatory action against the WANS preparations involved in this matter or against defendants based upon the alleged 'new drug' status of WANS until FDA makes an administrative determination of the new drug status of WANS in conformity with the enforcement priorities enunciated in FDA's Compliance Policy Guide 7132c.08 and the requirements of the Administrative Procedure Act, or unless verifiable and genuinely significant and new information surfaces which questions the safety or efficacy of a WANS preparation so as to justify taking regulatory action against such preparation out of the sequence provided by the Agency's Compliance Policy Guide 7132c.08."

No further action was taken in the case until January 28, 1980. On that date the FDA instituted a second seizure against WANS. Large quantities of the drug were again confiscated. A month later, on February 27, 1980, the district court consolidated the latest seizure action with the pending actions, and ordered the entire case to be,

> "remanded to the Food and Drug Administration (FDA) with instructions to defer regulatory action against the WANS preparations involved in this matter or against defendants based upon the alleged 'new drug' status of WANS until FDA holds a hearing pursuant to 5 U.S.C. § 554 and thereafter makes an administrative determination of the new drug status of WANS in conformity with the enforcement priorities enunciated in FDA's Compliance Policy Guide 7132c.08.

> "Accordingly, it is FURTHER ORDERED

> "That prior seizures ordered by the Court are left without effect.

"However, jurisdiction will be retained whether new, verifiable and genuinely significant information comes to light which questions the safety or efficacy of a WANS preparation so as to justify enforcement action against such preparation out of the sequence provided by the Agency's Compliance Policy Guide 7132c.08."

On April 8, 1980, the district court issued an Opinion and Order explaining and reiterating this order. We treat the two orders, which are the same but for their date of issuance, as a single order.

The United States filed separate appeals from the orders of February 27 and April 8, and these have been consolidated. The United States also moved for, and we have granted, a stay pending appeal with respect to the district court's order enjoining future seizures, and ordering the return of quantities of the drug already seized.

The United States presently attacks three aspects of the district court's order: (1) its instruction that the FDA "defer regulatory action against the WANS preparation . . . or against defendants" pending further administrative proceedings; (2) its decision to leave prior seizures of WANS "without effect"; and (3) its remand of the case to the agency. We consider these issues in turn; and in connection with each we also address this court's appellate jurisdiction.[1]

*The Order to "Defer" Regulatory Action*

■ Our jurisdiction to review the district court's interlocutory order that the FDA defer further regulatory action against WANS and Alcon depends on whether the order is appealable as one granting an injunction, *see* 28 U.S.C. § 1292(a)(1), or is simply, as Alcon contends, an exercise of the court's discretion in controlling a case before it. Looking to the order's "substantial effect," *see United States v. Cities Service Co.*, 410 F.2d 662,

663 n.1 (1st Cir. 1969); *Hotel & Restaurant Employees and Bartenders International Union v. Del Valle*, 328 F.2d 885, 886 (1st Cir.), *cert. denied*, 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964), we think it was an injunction, hence appealable under section 1292(a)(1). The order has the effect of forbidding the FDA from exercising in any forum its statutory power both to proceed against WANS and its producer and to seize the article pending condemnation. Absence of the word "enjoin" does nothing to mitigate the blanket severity of the decree. Whether regulatory action against a possibly unsafe or ineffective drug must be "deferred" or is "enjoined" is a matter of semantics. In either case, the agency is denied the ability to take summary steps to protect those to whom the drug will be distributed in the interim.

■ This injunction exceeded the district court's authority. To prevent this sort of eroding of the agency's protective powers, the Supreme Court in *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), held that district courts lack jurisdiction to enjoin multiple seizure actions instituted by the FDA under the Act. The rule of *Ewing* has been consistently and strictly observed, *see Southeastern Minerals, Inc. v. Harris*, 622 F.2d 758 (5th Cir. 1980); *Pharmadyne Laboratories, Inc. v. Kennedy*, 596 F.2d 568 (3d Cir. 1979); *Parke, Davis & Co. v. Califano*, 564 F.2d 1200 (6th Cir. 1977), *cert. denied*, 435 U.S. 942, 98 S.Ct. 1522, 55 L.Ed.2d 539 (1978); *Natick Paperboard Corp. v. Weinberger*, 498 F.2d 125 (1st Cir. 1974), *cert. denied*, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976), and controls the present case. We see no distinction between this case and *Ewing* merely because the latter involved multiple seizures for alleged misbranding, which may be instituted only when there is probable cause to believe that the article is dangerous or that the misbranding may be fraudulent or misleading. Risks to consum-

---

1. Alcon has moved for summary dismissal of the government's appeals, asserting lack of appellate jurisdiction. We advised that we would consider the motion when deciding the merits.

ers may be present in new drug cases, and the same section of the Act is involved. See 21 U.S.C. § 334(a)(1). The Supreme Court's decision in Ewing precludes judicial interference with the FDA's decision to institute enforcement actions, whatever the precise context. Compare Southeastern Minerals, supra, 622 F.2d at 763–64 with Parke, Davis & Co., supra, 564 F.2d at 1205 and Natick Paperboard, supra, 498 F.2d at 126–27. Alcon's argument that such a rule exposes a manufacturer to potentially devastating hardship and loss was disposed of in Ewing. See 339 U.S. at 604 05, 70 S.Ct. 875–76 (Jackson, J., dissenting). The considerations from which the Ewing holding emerged dictate that it be applied and that the district court's order, insofar as it bars initiation of further FDA enforcement actions, be vacated:

> "The purpose of the multiple seizure provision is plain. It is to arrest the distribution of an article that is dangerous, or whose labeling is fraudulent or misleading, pending a determination of the issue of adulteration or misbranding. The public therefore has a stake in the jurisdictional issue before us. If the District Court can step in, stay the institution of seizures, and bring the administrative regulation to a halt until it hears the case, the public will be denied the speedy protection which Congress provided by multiple seizures.

> \*    \*    \*    \*    \*    \*

> "The means which Congress provided to protect consumers against the injurious consequences of protracted proceedings would then be seriously impaired. Congress weighed the potential injury to the public from misbranded articles against the injury to the purveyor of the article from a temporary interference with its distribution and decided in favor of the speedy, preventive device of multiple seizures. We would impair or destroy the effectiveness of that device if we sanctioned the interference which a grant of jurisdiction to the District Court would entail. Multiple seizures are the means of protection afforded the public. Consolidation of all the libel suits so that one trial may be had is the relief afforded the distributors of the articles."

339 U.S. at 601–02, 70 S.Ct. at 873–74 (footnotes omitted). See also Premo Pharmaceutical, supra, 629 F.2d at 801; Natick Paperboard, supra, 498 F.2d at 127.

### The Dissolution of Prior Seizures

■ We agree with the United States that so much of the district court's order as purports to leave the FDA's former seizures "without effect" is appealable as a collateral order. See Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), discussed infra in connection with the remand order. The present situation is like that in Swift & Co. Packers v. Compania Colombiana Del Caribe, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950), where the Cohen rule was held to apply. The Supreme Court there stated,

> "Appellate review of the order dissolving the attachment at a later date would be an empty rite after the vessel had been released and the restoration of the attachment only theoretically possible. Under these circumstances the provision for appeals only from final decisions in 28 U.S.C. § 1291 should not be construed so as to deny effective review of a claim fairly severable from the context of a larger litigious process."

339 U.S. at 689, 70 S.Ct. at 865 (citations omitted). The same can be said as to the futility of later appellate review of this order requiring, it would seem, immediate release of the seized suppositories. We therefore turn to the merits of the present appeal.

It is the government's contention that the district court "ha[d] no authority simply to give back the seized property without determining ... whether or not the Act [was] violated." The Act provides that before

trial the court shall "allow any party to a condemnation proceeding ... to obtain a representative sample of the article seized" and that after condemnation the court has discretion to order the goods sold or destroyed, 21 U.S.C. § 334(c), (d), but otherwise is silent upon the release of seized goods prior to a decision upon the FDA's claims. Rule E(5)(c) of the Supplemental Rules for Certain Admiralty and Maritime Claims, which were intended to inform seizure procedure under the Act, see 21 U.S.C. § 334(b), states that seized property held by the marshal

> "may be released forthwith upon his acceptance and approval of a stipulation, bond, or other security, signed by the party on whose behalf the property is detained or his attorney and expressly authorizing such release, if all costs and charges of the court and its officers shall have first been paid. Otherwise no property in the custody of the marshal or other officer of the court shall be released without an order of the court; but such order may be entered as of course by the clerk, upon the giving of approved security as provided by law and these rules, or upon the dismissal or discontinuance of the action; but the marshal shall not deliver any property so released until the costs and charges of the officers of the court shall first have been paid."

Alcon contends that this portion of Rule E(5) implies some general grant of authority to a court to order the release of seized property. However, the purpose and focus of Rule E(5) is merely to describe the circumstances under which seized property may be released prior to a court's determination of the merits: thus it provides for release of property if a plaintiff consents, or when "approved security as provided by law and these rules" is tendered. Neither circumstance exists here (and, indeed, in a new drug case, where the purpose of the seizure is to remove a possibly risky drug from public use, it is hard to see how the mere putting up of security would be a proper basis for release). In any event, we see little in Rule E(5) by way of a general grant of authority permitting courts to countermand administratively instituted seizures without first adjudicating the merits of the agency's claim. If the seizure is plainly frivolous, the court can act rapidly and achieve justice in that manner, but its action should ordinarily follow, not precede, an adjudication. We have found only two cases that bear on the question. One holds, and the other suggests, that articles seized in an FDA enforcement action may not be released by the court prior to a judicial determination of whether they violate the Act. See In re United States, 140 F.2d 19 (5th Cir. 1943); United States v. 893 One-Gallon Cans ... Brown's Inhalant, 45 F.Supp. 467 (D.Del.1942).

█ We conclude that the district court erred in dissolving the administrative seizures of WANS without first addressing the merits of the seizure proceedings initiated by the FDA, including, as part thereof, the agency's contention that WANS is a "new drug." We therefore vacate this portion of the district court's order. The district court believed that allowing "the continued retention of the material seized would be an abuse of judicial discretion" in light of its findings that WANS "has been used for years" and that "the information which prompted the F.D.A. to initiate these actions was not only contradictory, but also insufficient to allow a causal relation." These preliminary and necessarily tentative and incomplete findings cannot serve as a substitute for a determination on the merits. It has been said that in pursuing a seizure action, the FDA must first allege sufficient facts to state a claim and must then prove its claim by a preponderance of the evidence. See United States v. 47 Bottles ... "Jenasol RJ Formula '60'", 320 F.2d 564, 569–71 (3d Cir.), cert. denied, 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963); United States v. 4 Cases ... Slim-Mint Chewing Gum, 300 F.2d 144, 148–50 (7th Cir. 1962). A decision by a district court as to whether the FDA has met those burdens would be the proper means for

adjudicating the validity of the FDA's enforcement efforts; a seizure should only be dissolved thereafter, in event of the government's failure to do so.

*The Remand to the FDA*

■ Remand of a case for further proceedings is ordinarily not appealable in that it is not a "final decision" from which appeals may be taken under 28 U.S.C. § 1291. *See Pauls v. Secretary*, 457 F.2d 294 (1st Cir. 1972). The government, however, argues that the district court's order in this case is appealable under section 1291 as a collateral order within the meaning of *Cohen v. Beneficial Industrial Loan Corp., supra*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528.

■ In *Cohen*, the Supreme Court held that a district court's refusal to order the plaintiff in a stockholders' derivative suit to post security for costs as required by a state statute was immediately appealable because it fell in "that small class" of decisions "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." 337 U.S. at 546, 69 S.Ct. at 1225. We have interpreted the Court's formulation in *Cohen* to require that appealability be predicated on four characteristics:

> "The order must involve: (1) an issue essentially unrelated to the merits of the main dispute, capable of review without disrupting the main trial; (2) a complete resolution of the issue, not one that is 'unfinished' or 'inconclusive'; (3) a right incapable of vindication on appeal from final judgment; and (4) an important and unsettled question of controlling law, not merely a question of the proper exercise of the trial court's discretion."

*United States v. Sorren*, 605 F.2d 1211, 1213 (1st Cir. 1979), *quoted in In re Continental Investment Corp.*, 637 F.2d 1, at 4 (1st Cir. 1980). The requisites may be summarized

as separability, finality, urgency, and importance. *In re Continental Investment Corp., supra*, slip op. at 6. *Cf. Grinnell Corp. v. Hackett*, 519 F.2d 595, 596 (1st Cir.), *cert. denied sub nom. Chamber of Commerce v. United Steelworkers*, 423 U.S. 1033, 96 S.Ct. 566, 46 L.Ed.2d 407 (1975) (arguing that "urgency" necessarily subsumes "finality"). *See generally Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. ——, —— – ——, 101 S.Ct. 669, 672–76, 66 L.Ed.2d 571 (1981). We find each characteristic to be present here and so hold that the order is appealable.

■ First, the remand order raises issues that are entirely separable from the ultimate question to be decided by this litigation, the "new drug" status of WANS. In remanding, the court ordered the FDA to hold "a hearing pursuant to 5 U.S.C. § 554 and thereafter make[ ] an administrative determination of the new drug status [of] WANS in conformity with the enforcement priorities enunciated in FDA's Compliance Policy Guide 7132c.08." The decree thus implicates the power of the agency to summarily initiate enforcement proceedings under the Act and its own regulations. It also puts at issue the manner in which FDA enforcement actions ought to proceed. These issues are independent of the merits of the underlying claim against WANS. *See Lopez v. Secretary*, 512 F.2d 1155 (1st Cir. 1975) (allowing appeal from remand requiring Secretary of HEW to show claimant had a "realistic opportunity" of being hired for available positions); *Gueory v. Hampton*, 510 F.2d 1222, 1224–25 (D.C.Cir. 1975) (allowing appeal from remand that required Civil Service Commission to show how conduct for which employee was dismissed had diminished the efficiency of the service); *Gold v. Weinberger*, 473 F.2d 1376, 1378 (5th Cir. 1973) (allowing appeal from remand holding that Secretary of HEW could not prove availability of reasonable job opportunities by testimony of vocational expert who had not interviewed claimant); *Cohen v. Perales*, 412 F.2d 44 (5th Cir.

1969), *rev'd on other grounds sub nom. Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (allowing appeal from remand establishing agency standards for the admission of hearsay evidence and holding that hearsay evidence is not substantial evidence to support agency decision).

Second, the district court's order is final as to these issues. There are no further steps that the government can take to avoid imposition of the procedural requirements it seeks to challenge here. *See Abney v. United States*, 431 U.S. 651, 659, 97 S.Ct. 2034, 2040, 52 L.Ed.2d 651 (1977). The district court has unambiguously declared in an order, a subsequent opinion and a denial of a stay motion that it will take no further actions pending FDA compliance with its decree. Its order therefore cannot realistically be characterized as not final because subject to revision. *Compare Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978); *Eluska v. Andrus*, 587 F.2d 996, 1001 (9th Cir. 1978). The district court's retention of jurisdiction over the case does not affect the finality of its order. *Compare United Transportation Union v. Illinois Central R.R.*, 433 F.2d 566, 568 (7th Cir. 1970), *cert. denied*, 402 U.S. 915, 91 S.Ct. 1374, 28 L.Ed.2d 661 (1971), *with Transportation-Communication Division, Brotherhood of Railway, Airline & Steamship Clerks v. St. Louis-San Francisco Ry.*, 419 F.2d 933, 936 (8th Cir. 1969), *cert. denied*, 400 U.S. 818, 91 S.Ct. 34, 27 L.Ed.2d 45 (1970).

Third, review of the remand order is urgent, for if we lack jurisdiction now over the questions presented, it seems improbable that they will ever be subject to review. *Compare Gueory, supra*, 510 F.2d at 1225 *and Gold, supra*, 473 F.2d at 1378 *and Perales, supra*, 412 F.2d at 48 *with Coopers & Lybrand, supra*, 437 U.S. at 469, 98 S.Ct. at 2458 *and Loya v. INS*, 583 F.2d 1110 (9th Cir. 1978) *and Barfield v. Weinberger*, 485 F.2d 696 (5th Cir. 1973).

Fourth and finally, the characteristic of importance is also present here.

> "Importance in this context refers to the scope of precedential value—to whether a case presents 'an important and unsettled question of controlling law', *United States v. Sorren, supra*, 605 F.2d at 1213, a decision as to which 'will settle the matter not simply for the case at hand but for many others', *Grinnell Corp. v. Hackett, supra*, 519 F.2d at 597."

*Continental Investment Corp., supra*, at 6. The government's appeal does not merely challenge an exercise of the district court's discretion, *see In re Grand Jury Proceedings*, 580 F.2d 13, 17 (1st Cir. 1978); instead, it raises broader questions of how FDA enforcement actions are to proceed. Resolution of these questions is important both to the future FDA regulatory efforts and to the public, whose safety may depend upon those efforts. We therefore proceed to the merits of the government's contentions.[2]

■ The district court premised its decision to remand to the FDA on interrelated

---

**2.** As to the appeal in general, Alcon argues that we are deprived of jurisdiction by 28 U.S.C. § 2105, which provides

> "There shall be no reversal in the Supreme Court or a court of appeals for error in ruling upon matters in abatement which do not involve jurisdiction."

Passing by the question whether this action is in abatement, we note that the district court's remand order can be understood as involving jurisdiction, *see Aetna State Bank v. Altheimer*, 430 F.2d 750, 753 (7th Cir. 1970), and our disposition of the case is not, technically, a "reversal," *see* 15 Wright, Miller & Cooper, *Federal Practice & Procedure: Civil* § 3903, at 414·15 (1976). In any event, despite its plain language section 2105 has never been interpret-ed as a significant limitation on federal appellate jurisdiction:

> "The most important feature of § 2105 is certainly its disuse.

> \* \* \* \* \* \*

> "[A]ppellate review ... is notoriously frequent with respect to such problems as abstention of federal decision in deference to state proceedings, deferral of judicial decision pending resort to the 'primary jurisdiction' of administrative agencies, or a requirement that private grievance proceedings be exhausted before seeking judicial interference in labor-management relations."

15 Wright, Miller & Cooper, *supra*, § 3903, at 414.

procedural and substantive grounds. The court was troubled by the agency's failure to conduct "a formal administrative determination of the 'new drug' status of WANS" before instituting suit against Alcon. In the absence of such a determination, the court felt that an FDA internal regulation—Compliance Policy Guide 7132c.08—precluded enforcement action against WANS unless the agency possessed "significant new information which questions the safety of the drug." However, the court characterized itself as ill-suited to decide the "new drug" status of WANS or to determine whether "significant new information" existed that questioned WANS' safety. Citing lack of jurisdiction, the doctrine of primary agency jurisdiction and prudential considerations, the court decided that these questions were better left to "the Agency entrusted by Congress with the necessary expertise to make a responsible determination." Accordingly, it ordered the action "remanded to the Food and Drug Administration to hold a formal administrative hearing pursuant to 5 U.S.C. § 554 on the issue as to whether WANS is a 'new drug' in conformity with the enforcement priorities enunciated in F.D.A.'s Compliance Policy Guide 7132c.08."

The court's concern over summary institution of enforcement proceedings is shared by some in the drug industry, see Swire, FDA's Multiple Seizure Powers: A Time for Equity, 34 Food, Drug, Cosmetic L.J. 244 (1979), but the imposition of a pre-enforcement hearing requirement (coupled with preliminary relief, as, to be meaningful, it would have to be) is at odds with the language and intent of the Act. To be sure, in certain circumstances a formal administrative proceeding is a precondition to agency action. For example, when the FDA issues, pursuant to 5 U.S.C. § 554(e), a declaratory order governing all drugs covered by a particular new drug application, or when it withdraws approval of a new drug application pursuant to 21 U.S.C. § 355(e), it

must first hold a hearing in compliance with section 554 of the Administrative Procedure Act, 5 U.S.C. § 554. See Hynson, supra, 412 U.S. at 620, 625, 93 S.Ct. at 2478, 2480. Each action is a "case of adjudication required by statute to be determined on the record after opportunity for an agency hearing" for purposes of the APA, 5 U.S.C. § 554(a). See 5 U.S.C. § 554(e) (declaratory order); 21 U.S.C. § 355(e) (withdrawal of NDA). By contrast, there is no statutory hearing requirement for FDA decisions to initiate seizure or injunction actions. See 21 U.S.C. §§ 332, 334. Indeed, the probable cause determination necessary to institute multiple seizure actions against allegedly misbranded products is to be made "without hearing." 21 U.S.C. § 334(a)(1). As the Supreme Court has made abundantly clear, a manufacturer subjected to an FDA enforcement action has no right to raise objections in an administrative forum prior to the agency's institution of the action. See Ewing, supra, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088. Cf. Abbott Laboratories v. Gardner, 387 U.S. 136, 146–48, 87 S.Ct. 1507, 1514–15, 18 L.Ed.2d 681 (1967) (reaffirming Ewing and distinguishing it from declaratory action brought by drug manufacturers challenging FDA regulations prior to their enforcement). This is because the imposition of any formal, pre-enforcement hearing requirement might seriously impair the effectiveness of the Act's enforcement provisions. See id.

The district court's concern that the FDA might be proceeding in violation of its own internal regulatory guidelines was also in error. Compliance Policy Guide 7132c.08 establishes FDA enforcement priorities for specific types of drugs, see infra, and declares that the FDA will depart from those priorities only under specified circumstances, one being receipt of "significant new information which questions the safety or effectiveness of the drug." A brief review of the history [3] and text of Compliance Poli-

3. Our discussion draws on several sources: United States v. Lannett Co., 585 F.2d 575 (3d Cir. 1978); Hoffmann-LaRoche, Inc. v. Wein-berger, 425 F.Supp. 890 (D.D.C.1975); Fleshner, Lannett, Premarketing Clearance and "Me-Too" Drugs; Where Do We Go From Here?, 35

cy Guide 7132c.08, however, demonstrates that the guideline does not apply to WANS.

Under the 1938 Federal Food, Drug, and Cosmetic Act, a drug had only to be proven safe to be approved by the FDA for interstate marketing. Approval of a new drug application was automatic within a fixed period after submission unless the FDA in the interim affirmatively disapproved it. The 1962 amendments to the Act substantially modified these premarketing clearance procedures. A "new drug" was redefined to be one not generally recognized among experts as *effective* as well as safe, and the automatic approval of new drug applications was eliminated. A "new drug" therefore could not be lawfully marketed unless it satisfied both the safety *and* effectiveness requirements of the Act and had been affirmatively approved by the FDA. These changes presented the FDA with an enormous problem: By virtue of the 1962 amendments thousands of drugs with NDA's already approved for safety, but not effectiveness ("pioneer" drugs), and many more thousands of drugs considered generically identical to already approved drugs ("me-too" drugs), became "new drugs" subject to the agency clearance procedure of section 505 of the Act, 21 U.S.C. § 355. To speed its newly created job of determining the effectiveness of these drugs, the FDA arranged to have the National Academy of Sciences-National Research Council conduct a Drug Efficiency Study of nearly 4,000 drugs. The results of this study were incorporated into Drug Efficiency Study Implementation (DESI) notices that indicated whether or not the FDA considered particular drugs to be effective. All distributors of drugs covered by a DESI notice and not holding an approved new drug application were variously required to submit either a full or abbreviated new drug application. However, upon submission and prior to approval of the required application, manufacturers of me-too drugs were permitted to market their products if a full new drug application had already been approved for the related pioneer drug. This approach to the administrative problems created by the 1962 amendments was struck down in *Hoffmann-LaRoche, Inc. v. Weinberger*, 425 F.Supp. 890 (D.D.C.1975), which held that *no* new drug—pioneer or me-too—could be introduced into interstate commerce without its new drug application having first been approved by the FDA.

Compliance Policy Guide 7132c.08 is the FDA's attempt to incorporate into the DESI program the holding of *Hoffmann-LaRoche*. Recognizing that independent evaluation of the effectiveness of all DESI drugs will unavoidably delay achievement of industry-wide compliance with the Act, the Guide sets out "a strategy to deal on a priority basis with those drugs which most affect public health and safety[,] to provide equitable treatment among competing firms, and to have a maximum impact on violative products." It establishes FDA enforcement priorities according to two general groups of drugs: "DESI prescription drugs where a final determination on effectiveness has been made" and "DESI and other prescription drugs where a final determination on effectiveness has not been made." Each group is further divided into several smaller categories.

WANS is not covered by Compliance Policy Guide 7132c.08 because it is not part of the DESI program. As Alcon expressly acknowledges, WANS is neither a pioneer drug (it is not covered by a pre-1962 NDA) nor a me-too drug (it is not generically identical to a pioneer drug). To read the phrase "other prescription drugs where a final determination on effectiveness has not been made," *supra*, as including WANS would impermissibly extend the Compliance Policy Guide far beyond its historic context and purpose. The proper scope of the second group of drugs defined by the Compliance Policy Guide is illustrated by its

---

Food, Drug, Cosmetic L.J. 44 (1980); Note, Regulating Laetrile: Constitutional and Statutory Implications, 5 U.Dayton L.Rev. 155 (1980); Note, New Drug Approval: *Lannett, The Drug Lag, and the NDA System*, 11 Rut.-Cam.L.J. 231 (1980).

three subcategories, none of which applies to WANS. It is true, as Alcon points out, that the FDA's initial regulatory letter described WANS as falling under this category, but later correspondence omitted this reference. In any event, Alcon does not claim that what the government concedes to have been an unfortunate mistake might now estop it from correctly treating WANS as a drug not covered by the Guide. The district court was thus in error to require that the FDA comply with Compliance Policy Guide 7132c.08 and withhold regulatory action against WANS in the absence of "significant new information which questions the safety or effectiveness of the drug."

Finally, we turn to the district court's belief that it lacked, or should not have exercised, jurisdiction over the "new drug" and "grandfather clause" questions in this case. The court's declaration that "[i]t is not within the jurisdiction of this Court to determine whether the drug in issue is or is not a new drug" is plainly incorrect. Jurisdiction over the new drug issue is shared by the FDA, see *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 653, 93 S.Ct. 2488, 2494, 37 L.Ed.2d 235 (1973); *Hynson, supra,* 412 U.S. at 624, 93 S.Ct. at 2480, and the federal district courts, see *CIBA Corp. v. Weinberger*, 412 U.S. 640, 644, 93 S.Ct. 2495, 2498, 37 L.Ed.2d 230 (1973); *Premo Pharmaceutical, supra,* 629 F.2d at 801; *United States v. "X-OTAG Plus Tablets",* 602 F.2d 1387 (10th Cir. 1979); *United States v. Mosinee Research Corp.,* 583 F.2d 930, 931-32 (7th Cir. 1978).

Further, the district court's invocation of the doctrine of "primary jurisdiction" to justify its refusal to exercise its own jurisdiction is not persuasive. As we have elsewhere stated, deference to an agency's primary jurisdiction makes little sense in the context of an enforcement proceeding initiated by the agency. *ICC v. B & T Transportation Co.,* 613 F.2d 1182, 1187 (1st Cir. 1980). This is especially true where, as here, a party remains subject to the agency's regulatory efforts despite the remand.

We have held above that a district court lacks the power to require the FDA to defer seizures *pendente lite* or to order release of seized drugs prior to a determination of the merits of the agency's claims. The effect of a remand to the agency thus would hardly be beneficial to the product's manufacturer. Without the relief afforded by the other aspects of the district court's order, Alcon would be deprived of a judicial remedy in return for an administrative procedure of uncertain duration before an unsympathetic agency. We would be surprised if either Alcon or the district court would be content with a remand under such circumstances. With this consideration in mind, and in view of the fact that the FDA's current position on the "new drug" status of WANS is already clear; that the FDA carries the burden of proving its position at trial; and that the agency has no duty to hold a pre-enforcement hearing or to justify its action under its Compliance Policy Guide, see supra, we do not see what would be gained in this case by a remand. At least it can be said that two fundamental purposes of deference to agency jurisdiction—"coordinating administrative and judicial machinery" and assuring uniformity of regulation, *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 580 (1st Cir.), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979)—would not be served by the district court's order. *See generally Litton Systems, Inc. v. Southwestern Bell Telephone Co.,* 539 F.2d 418 (5th Cir. 1976); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 532 F.2d 412 (5th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977); *ICC v. All-American, Inc.,* 505 F.2d 1360, 1362–64 (7th Cir. 1974).

This is not to say that a remand in the context of enforcement proceedings might never be appropriate. In *Bentex Pharmaceuticals, supra,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235, the Supreme Court upheld the power of a district court to refer to the FDA "new drug" and "grandfather clause" issues initially presented to the court in a declaratory judgment action instituted by

drug manufacturers. The Court went on to note that a court could stay its hand "[e]ven where no ... administrative determination has been made and the issue arises in a district court in enforcement proceedings. . . ." 412 U.S. at 652, 93 S.Ct. at 2493. This observation, however, should be understood in relation to the situation in *Bentex*, where some 21 drug manufacturers had requested declaratory relief. There the court was in essence being asked to issue, without benefit of prior administrative proceedings, a decision upon whether a substantial portion of an industry was complying with the Act. Here the district court is being asked only to decide whether a single drug manufactured by a single company is being marketed illegally. The agency's view of the question is clear and will have to be substantiated for the agency to prevail in court. We therefore conclude that under *Bentex* this is not an appropriate case for a remand.

As the district court recognized, a third purpose of the doctrine of primary jurisdiction—taking advantage "of agencies' special expertise," *Mashpee Tribe, supra,* 592 F.2d at 580—weighs in favor of a remand, but not, we think, decisively. The Supreme Court has described the "new drug" and "grandfather clause" issues as "the kinds of issues peculiarly suited to initial determination by the FDA." *Bentex Pharmaceuticals, supra,* 412 U.S. at 653, 93 S.Ct. at 2494. Nevertheless, contrary to the Court's suggestion it has not been "commonplace" for courts to await an appropriate administrative declaration in enforcement proceedings, *Bentex, supra,* 412 U.S. at 652, 93 S.Ct. at 2493; lower courts continue to hear and decide the "new drug" status of drugs challenged by the FDA in seizure and injunction actions. *See, e. g., Premo Pharmaceuticals, supra,* 629 F.2d at 804–05 (issue decided by the court of appeals); *"X–OTAG Plus Tablets", supra,* 602 F.2d 1387; *Mosinee Research, supra,* 583 F.2d 930; *United States v. Articles of Drug . . . Horomin,* 498 F.Supp. 424 (D.N.J.1980). The government asserts, and we have found nothing to the

contrary, that of the hundreds of enforcement actions brought by the FDA under section 505 since 1938, none save the present has been remanded to the agency. Returning issues in an enforcement action to the FDA imposes an administrative burden for which the Act makes no provision, and insofar as the procedure delays adjudication of the regulatory status of a drug, may work to the disadvantage not only of the agency and public, but also of the manufacturer. In such circumstances the power to remand must be used sparingly. Had the trial set for May 1979 been held, WANS' status would long since have been laid to rest. In deciding the case, the FDA's expertise would have been available to the court, in that to sustain its burden the agency would have had to present expert evidence establishing its claims regarding WANS. We therefore conclude that the district court erred in remanding the case to the FDA.

*The orders of the district court are vacated and the case is remanded for further proceedings consistent with this opinion.*