**UNITED STATES of America, Plaintiff,**

v.

**UNDETERMINED QUANTITIES OF DRUGS AS DESCRIBED IN ATTACHMENT A, Defendant.**

**No. 87 C 4665.**

United States District Court,
N.D. Illinois, E.D.

Dec. 21, 1987.

Frederick H. Branding, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

George M. Burditt, Steven M. Kowal, Sheryl A. Marcouiller, Richard O. Wood, Burditt, Bowles & Radzius, Ltd., Chicago, Ill., for claimant.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This case involves the seizure and potential condemnation of approximately $680,-000 worth of drugs used and manufactured by Travenol Laboratories ("Travenol") at its Regional Compounding Center ("TRC") in Morton Grove, Illinois. The United States government, the plaintiff in this action, seized the drugs on May 22, 1987, pursuant to a Complaint for Forfeiture granted by a district court that same day. Travenol has moved for the release from seizure of approximately $500,000 worth of these drugs pursuant to the Federal Food, Drug and Cosmetic Act ("the Act"), 21 U.S.C. § 301 *et seq.* and this court's equitable powers. This court has jurisdiction pursuant to 28 U.S.C. § 1345 and 21 U.S.C. § 334. For the reasons set forth below, the motion is granted.

## BACKGROUND

For the purposes of this motion, the facts are not in dispute. The $500,000 of drugs at issue here are "sterile active ingredients"—principally freeze-dried powders or concentrated liquids—that have been subject to Food & Drug Administration ("FDA") review and approval and are therefore perfectly lawful; *provided* they are packaged and sold in accordance with applicable regulations. According to the government, however, since the mid–1980s, Travenol has been engaged in a program ("the TRC program") in which it alters these "sterile active ingredients" to produce different drugs—"finished product"— and the TRC program does violate the Act.

On May 22, 1987, the government sought and obtained an order for the seizure of

approximately $680,000 worth of drugs from the TRC. Of these drugs, approximately $180,000 worth was "finished product"; the other approximately $500,000 worth were "sterile active ingredients." The government admits that the "sterile active ingredients" were not misbranded nor mislabeled and would thus be perfectly lawful drugs, were it not for their intended use in producing the allegedly unlawful "finished product."

On December 11, 1987, Travenol sought release of the "sterile active ingredients" on the condition that they would not be used in the TRC program but would instead be sold and/or distributed in a lawful manner.[1] Travenol noted that the "sterile active ingredients" have a limited "shelf-life" and argued that the continued forced storage of these products was resulting in undue waste of beneficial drugs as well as unnecessary storage costs.

The government responded that, even conceding everything Travenol said, this court lacks the power to order the release of the sterile active ingredients at this time. According to the government, these drugs were properly seized as the intended ingredients of unlawful drugs; accordingly, they may only be released in accordance with 21 U.S.C. § 334(d), which provides that a court may, in its discretion, order the release of products seized under the Act *after* a condemnation proceeding has been held and any issues regarding the lawfulness of the products resolved. Such condemnation proceedings have not yet been held.

On December 16, 1987, this court heard oral arguments on Travenol's motion.[2] During the arguments, both sides agreed that there exists only one question for this court to resolve now: Does § 304 of the Act, 21 U.S.C. § 334, prohibit this court from ordering the pre-condemnation re-lease of any products properly seized pursuant to the Act even where the government concedes that the goods, if released, would be in full conformity with the law?

## DISCUSSION

21 U.S.C. § 334, sets out a coherent scheme for the seizure, condemnation and final disposition of products which allegedly violate the Act. When the FDA believes that a drug violates the Act, it may seek condemnation of the drugs "on libel of information." 21 U.S.C. § 334(a). The drug may be seized pre-trial "by process pursuant to the libel." 21 U.S.C. § 334(b). The procedures employed by the court in resolving the motion for libel and any other pre-trial matters "shall conform, as nearly as may be, to the procedures in admiralty." 21 U.S.C. § 334(b).

Once a trial is held, and the drugs condemned, the district court may do any one of three things. It may order the drugs destroyed; it may order them sold; or it may order them "delivered to the owner thereof to be destroyed or brought into compliance with the provisions of this chapter under the supervision of an officer or employee duly designated by the Secretary." 21 U.S.C. § 334(d).

Thus, the statute does not directly address the question of whether drugs may be released prior to the completion of condemnation procedures. The defendant claims that, because it does not, this court may invoke its equitable powers to order the pre-condemnation release of the "sterile active ingredients."

In *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), the Supreme Court stated that "unless a statute in so many words or by a necessary and inescapable inference, re-

---

**1.** Although Travenol does not concede that the "finished products" or the procedures by which they are produced violate the law, it has agreed that this court must assume that they do for the purposes of this motion.

**2.** In the same motion, Travenol sought the release of the "finished products" for the sole purpose of destruction. Both parties agreed to this part of the motion, and this court, by minute order dated December 17, 1987, ordered the "finished products" released for destruction by Travenol after both parties have the opportunity to obtain samples for use in future litigation. Thus, the instant order and memorandum are addressed only to the "sterile active ingredients."

stricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." *Id.* at 398, 66 S.Ct. at 1089. In *United States v. K–N Enterprises, Inc.,* 461 F.Supp. 988 (N.D.Ill.1978), the court relied on *Porter* in ordering the post-condemnation recall of drugs, despite the absence in the Act of a specific provision for recall, because "the statute by which we are given jurisdiction over the controversy does not preclude such relief." *Id.* at 990.

The government insists that this case differs from *K–N Enterprises* because the statute's comprehensive scheme for condemning allegedly unlawful drugs gives rise to the "unescapable and necessary inference" that *pre-condemnation* release is always improper. In so arguing, the government ignores entirely the Act's instruction that admiralty procedures should inform the disposition of seizures pursuant to the Act. Admiralty Rule E(9) specifically provides for situations in which perishable goods have been seized:

> (b) *Interlocutory Sales.* If property that has been attached or arrested is perishable, or liable to deterioration, decay or injury by being detained in custody pending the action, or if the expense of keeping the property is excessive or disproportionate, or if there is unreasonable delay in securing the release of property, the court, on application of any party to the marshall, may order the property or any portion thereof to be sold; and the proceeds, or so much thereof as shall be adequate to satisfy any judgment, may be ordered brought into court to abide the event of the action; *or the court may, on motion of the defendant or claimant, order delivery of the property to the defendant or claimant, upon the giving of security in accordance with these rules.* (Emphasis supplied).

Thus, the Admiralty Rules specifically authorize the pre-condemnation release of certain seized goods. To be sure, the difference between the purposes of the Act and those of admiralty law may necessitate adjusting the Rules when applying them to seizures pursuant to the Act. Neverthe-

less, the Act's specific reference to the Rules strongly suggests that Congress did not intend to strictly limit the court's authority over seizure proceedings to those procedures specifically delineated on the face of the statute. The four cases cited by the government do not alter this conclusion.

In *United States v. Alcon Labs,* 636 F.2d 876 (1st Cir.1981), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3005, 69 L.Ed.2d 388 (1982), the court held, on the basis of its reading of § 334, that "articles seized in an FDA enforcement action may not be released by the court prior to a judicial determination of whether they violate the Act." *Id.* at 883, *citing, In re United States,* 140 F.2d 19 (5th Cir.1943); *United States v. 893 One–Gallon Cans, More or Less,* 45 F.Supp. 467 (D.Del.1942). The court agreed that "the Supplemental Rules for Certain Admiralty and Maritime Claims [Admiralty Rules] ... were intended to inform seizure procedure under the Act," *United States v. Alcon Labs,* 636 F.2d at 883, and that "Rule E(5) implies some general grant of authority to a court to order the release of seized property." *Id.* Nevertheless, it held that the district court erred when it released drugs which the FDA maintained were in violation of the Act's "new drug" provisions. *Id.*

Two aspects of that case render it inapposite the instant one. First, the drugs in that case were not perishable. Thus, the Court was forced to rely solely on Admiralty Rule E(5). That rule provides for the pre-trial release of property upon an order of the court after the giving of security; it does not, however, provide any guidance for determining when a court may properly grant such an order. Accordingly, the court saw "little in Rule *E(5)* by way of a general grant of authority permitting courts to countermand administratively instituted seizures without first adjudicating the merits of the agency's claim." *Id.* (emphasis added). This conclusion does not apply to the instant case, where Rule E(9) provides specific authority for the pre-condemnation release of *perishable* goods.

Second, and perhaps more importantly, the district court in that case had ordered the release of drugs which the government *continued to maintain* were harmful. In such situations, the court of appeals reasoned, strict application of the Admiralty Rules to § 334 proceedings would be improper. When the harmfulness of drugs remains at issue, "preliminary and necessarily tentative findings cannot serve as a substitute for a determination on the merits." *Id.*

That decision does not preclude an order releasing the "sterile active ingredients" prior to condemnation. Since no determination as to the harmfulness of these drugs will be made at trial, an order releasing them to Travenol on the condition that they not be used in the TRC program does not require this court to make the sort of "preliminary and tentative findings" that the *Alcon Labs* court feared would circumvent the statute's purposes.

Another case cited by the government does address a situation in which the claimant sought the pre-condemnation release of drugs which the government admitted were harmless. In *United States v. 893 One–Gallon Cans, More or Less*, 45 F.Supp. 467 (D.Del.1942), the government had seized poultry medicine on the grounds, not that it was harmful, but rather that it was misbranded. The claimant sought the pre-condemnation release of the drugs with a condition that the misbranding be remedied prior to sale.

The district court denied the request, but did so only because the seized goods were "nonperishable." *Id.* at 468. Indeed, the district court made specific reference to the Admiralty Rules' provisions for perishable goods—Admiralty Rule 11 at the time—and indicated that, had it been applicable, pre-condemnation release would have been appropriate. Thus, although the case is relied upon by the government, it actually supports Travenol's position that the "active sterile ingredients" may be released before they become stale.

The third case cited by the government for the proposition that pre-condemnation release is never appropriate under the Act

provides little help in the instant litigation. In *In re United States*, 140 F.2d 19 (5th Cir.1943), the district court had refused to conduct condemnation proceedings for allegedly unlawful butter manufactured by the claimant. Instead, the district court had granted the claimant's motion for release, instructing the claimant to recondition the butter and then return to the court for a determination as to the reconditioned butter's lawfulness.

The government sought a writ of mandamus from the court of appeals instructing the district court to vacate its order. The court of appeals, in a cryptic opinion, stated that it would not grant the writ immediately, but would do so if the district court did not allow the case to proceed to trial. Although the court stated that "the Plan of the Act" is for the court first to decide the merits and then to determine whether release is appropriate, and that "the statutory proceedings ought to be precisely followed," *Id.* at 20, these statements were, at best, *dicta.* Not only did the court make no reference at all to the Admiralty Rules, but it did not even order the district court to vacate the release of the unreconditioned butter. Accordingly, the decision does not advise the instant litigation.

The final case relied on by the government is the Seventh Circuit's recent decision in *United States v. An Article of Device ... Diapulse*, 650 F.2d 908 (7th Cir.1981). The court there held that the district court had erred when, after finding that certain devices were mislabeled under the Act, it "declined to condemn the devices and instead conducted a trial to determine [whether the owner's proposals for relabeling them were valid]." *Id.* at 909. The district court did not have the authority to determine, in the first instance, the validity of the relabeling. Instead, once it found that the original labeling violated the Act, it could only condemn the misbranded devices and return them to the owner for relabeling and reapplication to the FDA. That case is also inapposite to the instant one. Since the drugs which Travenol seeks to have released have already been subject to FDA review and approval, an order re-

leasing them will not usurp the agency's function in that regard.

Thus, the cases cited by the government do not preclude the conclusion that, at least where drugs are perishable and may be lawfully used without reconditioning or relabeling of any kind, a court may invoke its equitable powers to order precondemnation release. Nor should they. The Act was designed to protect the public from potentially harmful substances, not to deprive the manufacturer, and ultimately the public, of beneficial drugs which have already survived the rigors of administrative review and approval. Since the government concedes that, if the court has the equitable power to release these drugs, this case presents an appropriate situation for employing it, no further discussion is necessary.

### CONCLUSION

The $500,000 worth of "sterile active ingredients" seized by the government on May 22, 1987, are released to claimant Travenol Laboratories for use in accordance with law and other than in the TRC program. Travenol must post security of $500,000 prior to release.