UNITED STATES of America, Plaintiff–Appellee,

v.

BAXTER HEALTHCARE CORPORATION, Defendant–Appellant,

and

Glaxo Specialties, Inc., a corporation, Intervenor/Defendant–Appellant.

Nos. 89–2087, 89–2088.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 11, 1990.

Decided May 7, 1990.

Rehearing and Rehearing En Banc Denied June 6, 1990.

Anton R. Valukas, U.S. Atty., Frederick H. Branding, Asst. U.S. Atty., Office of the U.S. Atty., Chicago, Ill., and Eric M. Blumberg, Federal Drug Admin., Rockville, Md., for plaintiff-appellee.

Steven M. Kowal and George M. Burditt, Burditt, Bowles, Radzius & Ruberry, Chicago, Ill., for defendant-appellant.

Thomas P. Sullivan, William A. Von Hoene, Jr., Jenner & Block, Chicago, Ill., and Paul M. Hyman, Hyman, Phelps & McNamara, Washington, D.C., for intervenor-appellant.

Before CUMMINGS and WOOD, Jr., Circuit Judges, and PELL, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

The federal Food and Drug Administration (FDA) challenges a program involving the reconstitution, repackaging, freezing, and distribution of already approved drugs without specific FDA approval for final products of the program as new drugs. The district court granted the FDA's motion for a preliminary injunction prohibiting Baxter Healthcare Corporation ("Baxter") and intervenor Glaxo Specialties, Inc. ("Glaxo") from producing (so far as is relevant to this appeal) eight ready-to-use frozen antibiotic drug products pending trial on the merits. 712 F.Supp. 1352 (N.D.Ill.) (May 16, 1989, amending opinion of April 26, 1989). The FDA claims that Baxter and Glaxo must apply to the FDA for separate approval to combine drug powders and liquids that have already been approved by the FDA into packages that are readily usable by the hospitals, clinics, and physicians to whom they are sold. Addressing a much broader array of drug products than is involved in this appeal, the district judge held that the FDA could permissibly read the Federal Food, Drug, and Cosmetic Act of 1938 as amended (the FDCA) (Title 21 U.S.C. § 301–393) to prohibit the activities of the firms. Baxter and Glaxo respond that the FDA unreasonably demands more than one approval for the same drug products. The companies assert that they do not violate the FDCA in acting without separate FDA approval because by the FDA's admission the drugs which are the components of the final products have already been approved by the FDA and, the companies assert, are being combined in FDA-approved containers in the detailed manner prescribed by the FDA through manufacturing practices open to inspection by the FDA. Baxter seeks to avoid submitting the products to the FDA's new drug approval system. Because we cannot say that the FDA's action against the antibiotics is an impermissible exercise of the agency's legislatively delegated authority, the order of the district court as to those drug products must be affirmed.

## I. Background

Baxter is a large manufacturer and distributor of health-care products incorporated in Delaware originally as Travenol Laboratories, Inc. Since July 1982, Baxter has operated or attempted to operate a Travenol Regional Compounding Center ("TRC"), first opening a center in Morton Grove, Illinois, later adding a second in Bridgeport, New Jersey. Baxter created the TRC

program because many drugs do not leave drug manufacturers in final form for administration to patients, but instead are purchased in either lyophilized (freeze-dried) or liquid concentrate form. Hospitals have commonly responded to the need to prepare the drugs for administration to patients by operating their own centralized drug preparation programs for the reconstitution, dilution, repackaging, and in some cases freezing, of antibiotics in batches. The TRC program is designed to transform such powders and concentrates on a large scale into dosage packages suitable for immediate use by health-care providers, who then administer the drugs without further reconstitution or dilution.

The scale is large indeed. Baxter states that 6.9 million TRC products have been produced since 1985 and that approximately 1,200 hospitals have relied on Baxter for the reconstituted antibiotics (Joint Appendix (JA) at 32; Baxter Br. at 5). Through the TRCs, Baxter hopes to make a profit by performing more efficiently and safely operations otherwise left to hospitals and individual physicians. The TRC process is described in more detail below.

The FDA alleges that the TRC activities violate the FDCA because, in essence, the drug packages produced at the TRCs are new drugs which must be separately tested for safety and efficacy. The FDA states that Baxter is inappropriately relying on a labeling system intended to be used in the best professional judgment of medical professionals in the context of hospitals and clinics, not by commercial manufacturers on a large scale. Baxter and Glaxo [1] respond that the products at issue are in no sense new drugs because they are the direct result of the reconstitution of already approved component drugs in a manner which they assert is dictated by the FDA labels. The companies assert that they can follow the labels even more reliably and efficiently than can individual hospitals or doctors.

In June 1982, Baxter first advised the FDA that it would commence the TRC operation. There were earlier inspections by the FDA, but the record reflects that the FDA began to raise serious questions regarding the TRC program in 1986. Beginning in May 1986, FDA inspectors staged a series of inspections and held numerous meetings with Baxter employees, including one six-week inspection of the Morton Grove operation. This FDA activity culminated in a seizure of drug products at the Morton Grove TRC in May 1987 pursuant to a complaint for forfeiture. The drug company, then still called Travenol, sought release of those seized drugs that had not yet been reconstituted. The district judge held that the release of drugs that had not yet become finished products of the TRC program in advance of condemnation was proper because the drugs were perishable and could be used lawfully without violating the FDCA, even as the FDA read the Act. *United States v. Undetermined Quantities of Drugs as Described in Attachment A,* 675 F.Supp. 1113 (N.D.Ill. 1987) (Duff, J.). Finished products worth an estimated $180,000 were released by the district court to be destroyed by the drug company. *Id.* at 1114 n. 2.

The action involving the seizure was voluntarily dismissed by the government by an order dated May 12, 1988. The action

---

**1.** The district judge allowed Glaxo to intervene as a defendant on June 3, 1988, because it has a contract with Baxter under which Glaxo owns and delivers to Baxter for reconstitution and distribution two drugs, sold under the brand names of Fortaz (ceftazidime) and Zinacef (cefurozime), both of which are included in the injunction at issue. The remaining six antibiotics are owned by other companies that have not joined as intervenors. Baxter and Glaxo will generally be referred to here collectively as Baxter.

The parties agree that the FDA has approved new drug applications for both ceftazidime and

cefurozime in frozen, aqueous form since the district court's order in this case was issued. See JA at 229–234. Glaxo has remained a party to this appeal in order to protect its interest in the production of its drug products through the TRC process. Today's decision upholds the district court's order enjoining the TRC operations without separate FDA approval. We express no opinion regarding the production of Glaxo-owned drugs apart from those issues involving the TRC operations addressed by the district court.

giving rise to this appeal was a complaint for injunction filed by the FDA on April 28, 1988, an action separate from the seizure just described. The new complaint for injunction, followed shortly by a motion for preliminary injunction, is described below. It was similar to the first action except that it enlarged the number of challenged antibiotics from nine to eleven and added allegations that the drugs at issue were adulterated because they were not manufactured consistent with "good manufacturing practices."

In its complaint for injunction filed on April 28, 1988, the FDA relied primarily upon 21 U.S.C. § 321(p), in which the FDCA defines a "new drug" as "any drug * * * [which is] not generally recognized * * * as safe and effective [or] which has not, otherwise than in [safety and effectiveness] investigations, been used to a material extent or for a material time * * *." The FDA alleged the following violations regarding the TRC venture: (1) six drugs used in antitumor (chemotherapeutic) treatment were distributed in violation of 21 U.S.C. § 355(a) because they were "new drugs" within the meaning of 21 U.S.C. § 321(p) and were not approved pursuant to 21 U.S.C. § 355(b); (2) the same drugs were new, unapproved drugs misbranded in violation of 21 U.S.C. § 352(f)(1); and (3) eleven antibiotic drugs were misbranded in violation of 21 U.S.C. § 352(*l*) because they were not certified pursuant to 21 U.S.C. § 357(a) and not exempt from certification as provided in 21 U.S.C. § 357(c). The drug products directly relevant to this appeal are eight of the eleven antibiotics in this last category.

The FDA also alleged that all of these drugs were adulterated as defined in 21 U.S.C. § 351(a)(2)(B) because they were not being produced through "good manufacturing practices" as specified in 21 C.F.R. Parts 210 and 211. Title 21 U.S.C. § 351(a)(2)(B) provides that a drug "shall be deemed to be adulterated" if:

> * * * the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current

good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess; * * *.

Baxter takes the position that the FDA is fully authorized to raise issues of "good manufacturing practices" and that the power to require such practices is the exclusive tool the FDA should use in policing the TRCs. The parties agreed, however, to separate disputes regarding issues of "good manufacturing practices" from this case. The district judge so ordered. *Baxter Healthcare*, 712 F.Supp. at 1356 n. 8. Thus the FDA does not attack the conditions under which drugs are reconstituted at the TRCs in this case, only the fact that they are being reconstituted without separate FDA approval. By the same token, of course, Baxter's assertion that it has developed in the TRCs a thoroughly safe, ideally aseptic operation "more sophisticated than those in virtually any hospital or physician's office" (Baxter Br. at 13) must be ignored since resolution of such claims requires expertise that the FDA has not applied to this appeal.

The district court concluded that, with an exception not relevant here, the chemotherapeutic TRC products were "new drugs" within the definition of 21 U.S.C. § 321(p), had not received FDA approval pursuant to 21 U.S.C. § 355(a), and were therefore in violation of 21 U.S.C. § 331(a), (d), and (k). *Baxter Healthcare*, 712 F.Supp. at 1359. As to the antibiotic drug products, the district court concluded that Baxter had not received an exemption from the requirements of 21 U.S.C. § 357 for the products pursuant to 21 C.F.R. § 433.1, and thus that they were misbranded under 21 U.S.C. § 352(*l*) and could not be sold without violating 21 U.S.C. § 331(a) and (k). *Id.* As discussed more fully below, the regulation found at 21 C.F.R. § 433.1 creates four specific exemptions from the certification requirements of 21 U.S.C. § 357.

By an order of June 14, 1989, this Court granted Baxter's motion for a stay of the

injunction pending the outcome of this appeal pursuant to Fed.R.App.P. 8(a). Baxter has been free, pending release of this opinion, to reconstitute and ship the TRC antibiotics. Baxter Br. at 6.

Baxter represents that it no longer reconstitutes the chemotherapy drugs at the TRCs and it has not appealed from the district court's findings regarding those drugs. Baxter appeals from the district court's order of preliminary injunction only as it relates to eight antibiotic products: nafcillin; ceftazidime (Glaxo's Fortaz); piperacillin; cefuroxime (Glaxo's Zinacef); cefamandole; penicillin G; ticarcillin; and tobramycin.

Not surprisingly, the language used to describe the nature of the TRC processes is earnestly debated by the parties. See, e.g., Declaration of L. Allen (JA at 256, 257) (distinguishing "compounding" from "repackaging"). Nevertheless, it is possible to characterize the program at issue without resort to technical terms. The first seven drugs are purchased by Baxter as dry powders packaged in glass vials; tobramycin is purchased as a concentrated liquid in a glass vial. The first seven drugs Baxter reconstitutes into a solution with a fluid recommended in the manufacturer's FDA-approved labeling. This occurs by piercing the sealed vial with a needle, through which the reconstituting fluid is injected into the vial. After agitating the vial to assure that the powder is dissolved, the reconstituted drugs are pooled and transferred to polyvinyl chloride bags containing a diluent such as a saline or dextrose solution. These bags are manufactured by Baxter and sold under the trade names of Viaflex and Minibag. These bags, containing the admixture, are labeled, frozen, and then sold to health-care providers for intravenous or intramuscular injection in patients. Tobramycin is handled in the same way except that because it begins as a liquid concentrate, it is reduced in strength instead of being reconstituted.

Baxter relies heavily on its claim that it closely follows the FDA-approved package inserts for each of the antibiotics. The inserts specifically require the reconstitution of the drugs prior to administration and provide directions regarding how reconstitution is to be performed. The manufacturers' package inserts for three of the antibiotics—ceftazidime, cefuroxime, and cefamandole—refer to freezing of the drugs and specify expiration dates which Baxter asserts are consistent with the labelling of its TRC products.

The inserts for the five other antibiotics are less helpful to Baxter's case. For three of them—nafcillin, piperacillin, and ticarcillin—the inserts mention freezing, but Baxter acknowledges that the TRC expiration date extends beyond the dates used by the manufacturers based on independent stability studies performed by Baxter. The package inserts for the two remaining antibiotics—penicillin G and tobramycin—do not mention freezing and the TRC uses an expiration date longer than that used in the insert. Again, Baxter relies on its own studies in freezing these drugs.

The FDA also alleges the following differences between the FDA-approved manufacturers' labeling and the TRC products: (1) the TRC version of cefamandole is packaged in a Viaflex Minibag while the manufacturer's labeling calls for that drug to be stored in an Eli Lilly Faspack container after reconstitution; (2) the TRC label states a shorter shelf life (18 hours at room temperature) for cefuroxime than the manufacturer's label (24 hours at room temperature) (plaintiff's Br. at 19).

Baxter makes the following assertions that stand uncontested by the FDA regarding the TRC program as it is designed to function: (1) Each of the eight antibiotics—in its component, concentrated form—is approved by the FDA for manufacture and distribution in FDA-published monographs under a new drug application submitted by a manufacturer; (2) the containers filled with diluents into which the reconstituted drugs are placed are specifically referred to in FDA-approved labels for several of the antibiotics as appropriate storage vessels for the reconstituted antibiotics; (3) nothing is added to the final product in each case that is not mentioned in the FDA

labeling; (4) the FDA-approved instructions are used by doctors and pharmacists to effect the same combinations made by Baxter, and contemplated by the FDA-approved package inserts, without further approval from the FDA.

The FDA's view of the TRC operation is well summarized in the following passage from the affidavit of an associate professor of Pharmacology:

> [T]he TRCs are compounding drug products, not repackaging the lyophilized powders or liquid concentrates. Compounding is one type of manufacturing, in which various active and inactive ingredients are placed in a container/closure system. The products compounded by the TRCs are new medications, with significant differences from the starting materials, * * *.

(Declaration of J. Benvenuto, JA at 289).

Baxter's view could be summarized by this passage from the affidavit of a professor emeritus of Pharmacy:

> [T]he TRCs are carrying out the very same steps as those performed in hospital pharmacy batch preparation admixture programs. The higher volume of drugs prepared at the TRCs allows them to institute additional environmental, process, and quality controls. * * * [T]he TRC[s] follow the drug manufacturer's directions for reconstitution and dilution. * * * The TRCs' freezing of the eight antibiotic drug products and determination of appropriate stability periods does not differ from similar programs carried out in the most sophisticated hospital pharmacies on the same drugs.

(Declaration of C. Latiolais, JA at 54).

## II. The Statute and Regulations at Issue

Each of the eight component drugs at issue is subject to regulation under Section 507(a) of the FDCA (21 U.S.C. § 357(a)) as an antibiotic, the infection-fighting drug defined in the FDCA as that "produced by a microorganism and which has the capacity to inhibit or destroy microorganisms in dilute solution * * *." 21 U.S.C. § 357(a). It also appears that the TRC program must pass muster not only under the terms of the clearance system for antibiotic drugs set forth in Section 507 but also under the terms of the controls for non-antibiotic "new drugs" provided at 21 U.S.C. § 355. *Barr Laboratories, Inc. v. Harris*, 482 F.Supp. 1183, 1185 (D.D.C.1980); S.Rep. No. 410, 79th Cong., 1st Sess. 3–4 (1945). But see companion cases of *Glaxo, Inc. v. Bowen*, 640 F.Supp. 933, 936–938 (E.D.N.C. 1986), and *Glaxo, Inc. v. Heckler*, 623 F.Supp. 69, 73 (E.D.N.C.1985). The FDA by explicit statement (Pl.Br. at 10, n. 12) and Baxter by tacit acknowledgment (*e.g.,* Baxter Br. at 28) agree that 21 U.S.C. § 355 is at issue. We need not settle that question, however, because of our holding today that the FDA permissibly reads Section 507 as granting it sufficient authority to enforce the injunction.

Under Section 507, the Commissioner of the FDA[2] has the authority to certify every batch of antibiotic drug as safe and effective:

> A batch of [antibiotic for human use] shall be certified if such drug has such characteristics of identity and such batch has such characteristics of strength, quality, and purity, as the Secretary prescribes in such regulations as necessary to adequately insure safety and efficacy of use, but shall not otherwise be certified.

(21 U.S.C. § 357(a)).

The enforcement provisions state that an antibiotic drug that is neither certified nor exempted by regulation pursuant to Section 507 of the FDCA is deemed "misbranded" in violation of the statute, may not be distributed interstate, and may be seized and condemned. 21 U.S.C. §§ 331–334, 352(*l* ). The FDA has authority to exempt drugs from the certification requirements of Section 507 whenever such requirements

---

**2.** The Act names the Secretary of the Department of Health, Education and Welfare, which has of course been redesignated the Department of Health and Human Services (HHS). The relevant duties of the Secretary of HHS have been delegated to the Commissioner of the FDA, which is part of HHS. 21 C.F.R. § 5.10.

"are not necessary to insure safety and efficacy of use," 21 U.S.C. § 357(c), and to promulgate exempting regulations "relating to the protection of the public health," 21 U.S.C. § 357(d).

Section 507 of the FDCA authorizes the FDA to promulgate regulations requiring that each batch of antibiotic drug be certified. A batch is a specific homogenous quantity produced under a single order during one manufacturing cycle. 21 C.F.R. §§ 210.3(b)(2), 430.3(e). In 1982, however, the FDA exempted all antibiotic drugs for human use from the batch certification requirement that had been authorized by Congress. See 21 C.F.R. § 433.1. This regulatory exemption was to apply so long as four conditions were met, only two of which are relevant here: (1) that the drug has been approved for marketing (pursuant to the approval procedures and requirements found in 21 C.F.R. Part 314), and (2) that the drug is packaged and labeled for dispensing in accordance with the applicable monograph, except where other labeling has been approved pursuant to an application. 21 C.F.R. §§ 433.1(b)(1), (2).

In defending its use of its own studies in determining whether to freeze drug products and for what time period, Baxter refers to 21 C.F.R. § 211.166, which requires that manufacturers perform and maintain data concerning stability testing. Baxter states that it has no objection to this regulation and suggests that it is through such provisions that the FDA has ample authority to inspect the TRC program and compel compliance with good manufacturing practices.

### III. Standards of Review

This Court recently summarized precedent of the Supreme Court and this Court, as well as the Administrative Procedure Act, on the standards of review relevant to agency interpretations of statutes and regulations. *Wisconsin Electric Power Co. v. Reilly*, 893 F.2d 901, 906–908 (7th Cir. 1990). These authorities state that an administrative agency's interpretations of congressional acts, and even more so of its own regulations, are due great deference.

The major case is *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which teaches that courts must review an agency's interpretation of the statute that it is entrusted to administer in two steps, which are defined by the clarity of congressional intent found in the law at issue. If Congress addressed the question directly, then the court is to "give effect to the unambiguously expressed intent of Congress," regardless of agency interpretations that have strayed from that intent. *Id.*, 104 S.Ct. at 842–843. If, on the other hand, the statute is "silent or ambiguous with respect to the specific issue," then courts are to inquire only "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

The district court in this case noted and applied this test. *Baxter Healthcare*, 712 F.Supp. at 1358, 1360. The court also introduced its opinion with comments emphasizing the importance of judicial deference to "the public's legislated concern for its protection from poor drugs." *Id.* at 1354. This is a point well taken, not least because the particulars of pharmaceutical chemistry are considered to be beyond the ken of federal judges. See F. Heffron & N. McFeeley, The Administrative Regulatory Process 314 (1983) (courts second-guessing administrative decisions typically "do not make better technical decisions than agencies").

This Court gives substantial deference to a district court's decision to grant a preliminary injunction insofar as that decision involves the discretionary acts of weighing evidence or balancing equitable factors. *Lawson Products, Inc. v. Avnet, Inc.*, 782 F.2d 1429 (7th Cir.1986). Nevertheless, the more purely legal conclusions made by a district court in granting a preliminary injunction are subject to *de novo* review. *Id.* at 1437. This case presents the question whether the district court was correct in concluding that the FDA's interpretation of the FDCA was permissible so that the injunction authorized by the FDCA was properly triggered by a violation of the

FDCA. That question, which precedes such issues as whether there is cognizable danger of recurrence requiring an injunction, is an essentially legal one.

Finally, we note the "well-accepted principle that remedial legislation such as the Food, Drug, and Cosmetic Act is to be given a liberal construction consistent with the Act's overriding purpose to protect the public health, and specifically, § 507's purpose to ensure that antibiotic products marketed serve the public with 'efficacy' and 'safety.'" *United States v. An Article of Drug ... Bacto–Unidisk ...*, 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726. Congress clearly intended to inspire great confidence among the public regarding the safety of antibiotic drug products and to ensure that the confidence is warranted.

## IV. Analysis

There is no language in the FDCA stating that a new antibiotic application is unnecessary when a company markets a product that is "exactly the same" as one approved for manufacture, nor is there language to the opposite effect. Congress did not address this issue directly and so *Chevron*'s second prong requires a determination of whether the FDA's interpretation is "permissible."

The FDA cites the general rule of statutory construction that a party claiming the benefit of an exception to some statutory prohibition carries the burden of proving that it should receive the benefit of that exception. *United States v. First City Nat'l Bank*, 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151, *United States v. 9/1 Kg. Containers*, 854 F.2d 173, 176 (7th Cir.1988), certiorari denied, — U.S. ——, 109 S.Ct. 1118, 103 L.Ed.2d 181. The FDA considers this rule of statutory construction relevant because, as stated above, Congress granted the FDA authority to exempt drugs from the certification requirements of Section 507(a) at its discretion after considering safety, efficacy of

use, and the general protection of the public health. 21 U.S.C. § 357(c), (d).

■ Baxter responds that it does not seek an exemption from Section 507(a) of the FDCA, but instead has complied fully with the FDCA because its drug products are in fact certified drugs. Thus the first and it would appear largely decisive question in this appeal is this: may the FDA permissibly interpret the term "antibiotic drug" in Section 507(a) as including the TRC drug products subject to a new round of certification? We conclude that it may.

In order to find a construction permissible, courts "need not conclude that the agency construction was the only one it permissibly could have adopted * * *, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. This may be the archetypal case calling for agency expertise. The FDA states that as a matter of science Baxter is "compounding" substances to produce drugs that differ in important, if sometimes subtle, ways from those component substances. In order to side with Baxter, we would need to find the authority to disagree with the following assertions solicited by the FDA in this case: (1) "leaching" (that is, movement of chemicals into the bag contents) from the plastic bags used as the final container for the TRC products may change the chemical composition of the TRC products with possibly harmful effects (JA at 267–268, 290, 296–297);[3] (2) the longer than approved expiration dates for nafcillin, piperacillin, and ticarcillin may have the effect of altering the concentration of the drug, with possibly harmful effects (JA at 290–291, 324, 325–326); (3) similarly, the freezing of penicillin G and tobramycin without approval and use of an expiration date longer than that used in the insert might have the same effects (*id.*); (4) a change in the method of manufacture of the component powders or liquids by their respective manufacturers "could result in

---

**3.** See also 21 C.F.R. § 310.509(a), which states that any injectable drug product packaged in plastic "is not generally recognized as safe and

effective" and is "a new drug within the meaning of section 201(p)" of the FDCA.

the appearance of new impurities or degradation" of the TRC products, since adjustments might be required to be made by Baxter (JA at 297). In the view of the FDA, such concerns are not answered without adequate scientific testing to certify each drug product as a drug. Or, put in the terms of the FDCA, the drug products are "misbranded" pursuant to 21 U.S.C. § 352(1) because they are not antibiotics certified under 21 U.S.C. § 357(a) or exempt from certification pursuant to 21 U.S.C. § 357(c), (d).

Much of Baxter's argument appears to rest on the inaccurate view that the courts may not allow federal agencies to use more rigorous methods of enforcement of a statutory scheme when less rigorous methods would also be allowable under the statute. The fact that some of the FDA's goals could be accomplished through the enforcement of "good manufacturing practices" standards does not mean that the FDA may not use its authority under Section 507(a) to ensure the "strength, quality, and purity" of antibiotic drugs through certification of new drug products such as the TRC products. The intent of the certification requirement of Section 507(a) was to mandate approval of those drugs deemed new by the FDA *before* they reach patients.

The thoughtful dissenting opinion emphasizes the fact that the FDA allows hospital pharmacists to mix these drugs for ready administration to patients while reining in commercial compounding, freezing, and distribution operations. First, this point overlooks the admitted discrepancies between the FDA instructions and Baxter's practice discussed above. Even if the FDA treated individual physicians and large pharmaceutical concerns alike, the TRCs would be producing drugs different from those described in the FDA materials. Second, such enforcement decisions rest with Congress. The federal courts are to "leave to Congress * * * the decision as to whether an agency's refusal to institute proceedings should be judicially reviewable." *Heckler v. Chaney*, 470 U.S. 821, 838, 105 S.Ct. 1649, 1659, 84 L.Ed.2d 714. As the district court noted in this case, Congress

has decided to treat commercial manufacturers of drugs differently from pharmacies and individual physicians in contexts closely related to that presented in this appeal. See *Baxter Healthcare*, 712 F.Supp. at 1358–1359, and provisions cited therein. Therefore, to the extent Congress has addressed the issue, it has decided to focus governmental resources upon the commercial distributors of drugs rather than upon the trained pharmacists and physicians who must reconstitute drugs for patient use on a smaller scale. One sound argument for this choice is evident: A drug improperly compounded on a large scale will harm more patients than the same compounding mistake made on a smaller scale.

Baxter's program is not saved by the precedent it cites. In *United States v. Generix Drug Corp.*, 460 U.S. 453, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983), the Supreme Court held that the term "drug" as used in the FDCA refers not only to the active ingredient in a drug product, but to the entire product. A distributor of generic drugs argued that "drug" means only "active ingredient," not including "excipients" such as coatings and capsules, so that new FDA approval was not required for those drug products which contain already approved active ingredients. The Supreme Court read the language of 21 U.S.C. § 321(g)(1), which defines the term "drug," as "quite plainly" encompassing generic drug products in their entirety. *Id.* at 458–459, 103 S.Ct. at 1301–1302. The Court found that this reading was supported by other sections of the FDCA and that none of the drug distributor's references to the legislative history of the FDCA pointed to a different conclusion. *Id.* at 459–460, 103 S.Ct. at 1301–1302.

The Court declined, however, to explore the extent to which new drug products that are "bioequivalents" of approved drugs might be excluded under the statute. *Generix*, 460 U.S. at 460–461, 103 S.Ct. at 1302. The record in *Generix* included evidence that excipients might vary in their rates of solubility, raising the possibility of too rapid "dumping" of active ingredients into the

bloodstream with harmful results. *United States v. Generix Drug Corp.*, 654 F.2d 1114, 1115 (5th Cir.1981). On this record Justice Stevens commented:

> [W]e are not required to determine what types of differences between drugs would be significant or insignificant under the statute. Respondent Generix argues only that its products are not new drugs under the theory that "drug" means "active ingredient"; it does not argue that its complete products—active ingredients and excipients together—are the same as previously approved products. * * * We thus do not reach the issue of whether two demonstrably bioequivalent products, containing the same active ingredients but different excipients, might under some circumstances be the same "drug."

460 U.S. at 461, 103 S.Ct. at 1302.

The term "bioequivalent" requires special attention because of its use by the Supreme Court. As the district court noted in the present case, 712 F.Supp. at 1357 n. 9, the term "bioequivalent" is defined at 21 U.S.C. § 355(j)(7)(B) for the purposes of subsection (j) of Section 355 of the Act, which relates to "Abbreviated New Drug Applications," a subsection not directly at issue here.[4] The definition reads:

> (B) A drug shall be considered to be bioequivalent to a listed drug if—
>
> (i) the rate and extent of absorption of the drug do not show a significant difference from the rate and extent of absorption of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses; or
>
> (ii) the extent of absorption of the drug does not show a significant difference from the extent of absorption

of the listed drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses and the difference from the listed drug in the rate of absorption of the drug is intentional, is reflected in its proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug.

The district court in this case stated that the TRC program could not meet even this definition and summarized Baxter's position cogently. "Baxter essentially asks this court to extend the bioequivalency exception—a mere suggestion in *Generix Drug*—to cover compounds that are equivalent to products resulting from FDA-approved drugs." *Baxter Healthcare*, 712 F.Supp. at 1357. The Supreme Court used the term "bioequivalent" to describe a hypothetical drug product so identical in its chemical makeup and effect on patients to a fully approved product that it would be absurd to allow the federal government to call it a new and different drug. The FDA in the present case argues strenuously and credibly that the TRC products would not fit that description.

Baxter calls attention to a Third Circuit case in which a wholesale drug distributor and two of its officers were charged with criminal violation of 21 U.S.C. § 355(a) by introducing a "new drug" into interstate commerce without first receiving FDA approval for the drug. *United States v. Kaybel, Inc.*, 430 F.2d 1346 (1970). The government had secured a conviction of the distributor for merely repackaging tablets of an approved drug by transferring tablets from the manufacturer's 500–unit bottles into the distributor's own 100–unit bot-

---

4. The current subsection (j) of Section 355 was added to the FDCA during the year following the 1983 *Generix* decision as part of the Drug Price Competition and Patent Term Restoration Act of 1984. Sept. 24, 1984, Pub.L. 98–417, Title I, § 101; see 1984 U.S.Code Cong. and Admin. News, pp. 2647, 2664. The Supreme Court's use of that term may have been drawn from 21 C.F.R. § 320.1(e), which carried a similar definition.

The Fifth Circuit had used the term "bioequivalent" without citing a source or definition. *United States v. Generix Drug Corp.*, 654 F.2d 1114, 1115, 1119–1120 (1981). The district court used the term without citing a specific source and defined it this way: "Drug products which are bioequivalent can be used interchangeably for the treatment of the same illness." *United States v. Generix Drug Corp.*, 498 F.Supp. 288, 291 (S.D.Fla.1980).

tles. *Id.* at 1347. The Third Circuit reversed the conviction as "an unwarranted distortion" of congressional intent. *Id.* at 1347.

The present case bears even less resemblance to the *Kaybel* repackaging case than it does to the "bioequivalency" exception mentioned in the *Generix* dicta. Manipulating and freezing these antibiotics may, in the view of scientists, transform them into "new drugs" requiring their own approval under the statute. The FDA has not clearly attempted to reach beyond the authority Congress delegated to it, even if in the view of Baxter it should enforce the laws differently.

Though the FDA may rely entirely on 21 U.S.C. § 357(a), we note that the FDA's position appears consistent when viewed in the light of the FDA regulation which addresses the factors that may make a substance a "new drug" subject to approval under 21 U.S.C. § 355. That regulation states that the "newness of a drug may arise by reason (among other reasons)" of a series of factors, including "[t]he newness for drug use of the proportion of a substance in a combination, even though such combination containing such substance in other proportion is not a new drug," and "[t]he newness of a dosage, or method or duration of administration or application, or other condition of use prescribed, recommended, or suggested in the labeling of such drug, even though such drug when used in other dosage, or other method or duration of administration or application, or different condition, is not a new drug." 21 C.F.R. § 310.3(h)(3), (5). The wording of this regulation suggests that the concerns raised by the FDA in this case are not imaginary obstacles, but part of a policy designed to effectuate the FDCA.

Similarly, one section of the FDCA (21 U.S.C. § 355(b)(1)(D)) requires anyone seeking approval of a new drug to provide "a full description of the methods used in, and the facilities and controls used for, the manufacturing, processing, and packing of such drug." This illustrates a congressional view that the way in which drugs are mixed and packaged is no less important than the chemical makeup of the drugs at issue. See also 21 C.F.R. § 314.50(d)(1)(ii), (e)(2)(i); 21 C.F.R. § 314.70. The FDA points out that these provisions would allow the FDA to prevent Baxter from running the TRC program if Baxter had itself received FDA approval for the antibiotics, so that *a fortiori* Baxter may not do so now as the purported "repackager" of those drugs.

Also within the context of 21 U.S.C. § 355, this Court has recognized the logic of the FDA's position that a new drug may be created through the combination of approved drugs. *United States v. Articles of Drug,* 826 F.2d 564, 566 (1987) (citing 21 C.F.R. § 310.3(h)(2)). It is true that the FDA labeling system—which recognizes reconstitution and repackaging for administration as the only reason for the manufacture of the approved drugs—suggests that the "new drug" created out of the approved drugs should meet with relatively swift approval. It is nonetheless not the place of the judiciary to dictate approval in cases in which the FDA is not confident that the method of synthesis will produce a safe product.

As a policy choice, Congress has exempted pharmacies and physicians from the registration and inspection requirements that apply to all manufacturers of drugs. 21 U.S.C. §§ 360(g)(1), (2), 374(a)(1), (2). The FDA only follows that lead by focusing on the mass commercial distribution of drugs rather than at the individual level of hospitals and pharmacists. This does not suggest that the FDA has taken a path which is "manifestly contrary to the statute," *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782, but to the contrary suggests sound adherence to congressional intent. The methods used in small-scale drug admixture programs carried out by medical professionals may carry some of the same hazards complained of by the FDA regarding the TRC operations. But, as stated above, it is not illogical for Congress to suggest, and the FDA to effectuate the suggestion, that those hazards are most effectively met at the manufacturing level of the medical establishment.

Our decision rests in part on the fact that Baxter has not followed the precise FDA "recipe" for the mixing, packaging, freezing, and labeling of each ready-to-use drug. A word is necessary regarding the two products owned by Glaxo, since that company argues vigorously that even under the strictest standards, it has followed every aspect of that process contemplated by the FDA and requires only direct application of the *Kaybel* repackaging exception. The problem with this argument is that it ignores the FDA's core position that merely by issuing such "recipes" the FDA does not give away its authority to challenge products that result from compounding processes which have not been separately analyzed. Congress has not directed the FDA to establish a "reconstituting system." Instead, it has established a batch certification procedure for antibiotic drugs which clearly delegates extremely broad authority to the FDA to ensure the "characteristics of strength, quality, and purity" that support safe and potent drugs. The FDA's decisions to modify the "batch" requirement and to use a labeling system have not reduced its authority in the way that Glaxo suggests.

The district court's interest in effectuating the "public's legislated concern" regarding regulation of drugs appropriately places emphasis on the intent of Congress in creating the FDCA. "The FDA rather than the courts must first determine the safety and effectiveness of a drug." *Premo Pharmaceutical Laboratories, Inc. v. United States*, 629 F.2d 795, 804 (2d Cir. 1980). Deference is of course inappropriate "where there are 'compelling indications that [the agency] is wrong.'" *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 94–95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969)). The Supreme Court's teaching in *Chevron* did not alter that proposition. See *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782; see also *Sullivan v. Zebley*, —— U.S. ——, 110 S.Ct. 885, 897, 107 L.Ed.2d 967. This case, however, does not present compelling indications that the judgment of the FDA is wrong.

Having found that the district court was correct in concluding that the FDA's interpretation of the FDCA was permissible so that the preliminary injunction authorized by the FDCA (21 U.S.C. § 332) was properly triggered by a violation of the FDCA, we also conclude that the district court appropriately granted the motion for preliminary injunction under the standards set forth in *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). However, we have not prejudged the merits of this controversy which are before the district judge after trial. Our holding merely is that the FDA has made out a sufficient case for the issuance of a preliminary injunction.

## V. Conclusion

For these reasons, the district court's order granting the government's request for a preliminary injunction is affirmed as to those eight drug products at issue in this appeal.

PELL, Senior Circuit Judge, dissenting.

The majority opinion has reached the conclusion that the district court's granting of a preliminary injunction against the process in which Baxter was engaged was proper and therefore has affirmed the granting of the preliminary injunction. I am unable to agree and respectfully dissent.

The principal issue on this appeal, as I see it, is whether the reconstitution of fully FDA-approved antibiotics in a manner consistent with the labeling directions, using a diluent meeting the specifications in those directions, and placing the reconstituted antibiotic into an FDA-approved Viaflex plastic container, constitutes the manufacture of a "new" drug according to 21 U.S.C. § 321(p) which must be separately approved pursuant to 21 U.S.C. § 355 or 357. The issue concerns only eight reconstituted antibiotics.

What is not the issue is the repackaging procedure which is controlled by Current Good Manufacturing Practice, 21 C.F.R. Parts 210 and 211. Baxter recognizes this

right of control on the part of FDA as to which it does not object. Its contention simply was that there was no policy or legal justification for the imposition of the time-consuming and expensive new drug application requirement.

The facts of this case on which the court has ruled are to be found in the district court's memorandum opinion and uncontroverted affidavits filed by Baxter in that court. Practically, every hospital in this country administers antibiotics intravenously every day. In fact, a large percentage of hospital patients receive such drugs at some time during their treatment. In one large representative hospital, approximately 40 percent of the patients received such antibiotics.

The antibiotics that are used in these hospitals are not always received from the drug manufacturer in a finished state. Rather, they are usually delivered as lyophilized (freeze-dried) powders in order to extend the shelf life of the drug. These lyophilized drugs must be reconstituted into liquid form before they may be administered to patients. The lyophilized powders simply cannot be administered to patients without reconstitution.

Admixture programs (centralized drug preparation programs, for the reconstitution of these antibiotics) began in about 1972. Typically, the reconstitution process is described in the manufacturer's instructions for use which accompany the drug.

When a single dose of an antibiotic, or a very small number of doses, are to be reconstituted, the reconstitution is done with a needle and syringe. An appropriate amount of sterile reconstituting fluid is drawn into the syringe, the needle is inserted through the stopper of the manufacturer's vial of lyophilized drug, and the reconstituting fluid is inserted into the vial. The powder and fluid are then agitated to form a solution.

Many intravenous antibiotic drugs are also diluted after reconstitution and before administration to patients. Several manufacturers, including Baxter, produce FDA-approved, pre-filled, diluent containers (an intravenous solution plastic bag) used for the administration of a single dose of a drug.

After reconstitution and dilution in the pre-filled, plastic polyvinyl chloride bags, the antibiotics are ready for intravenous infusion. One of the polyvinyl chloride bags that is used for this purpose is manufactured by Baxter, and sold under the trademarks of Viaflex and Minibag.

The single dose preparation technique for intravenous antibiotics is practiced at virtually all hospitals. Many larger hospitals, however, cannot meet their need for intravenous antibiotic drugs through the single dose preparation method. Many of these hospitals have established centralized drug preparation programs in which they reconstitute, dilute, and repackage the antibiotics in batches. It is not cost-effective for a hospital of more than 300 beds to engage in single dose reconstitution of antibiotics. Hospitals that engage in this type of centralized drug preparation do not necessarily reconstitute the antibiotics in response to an order for a specific patient. Some of these hospitals prepare batches of reconstituted antibiotics sufficient for one day's needs. Other hospitals prepare large batches intended to be used over a relatively long period of time. At least one hospital has prepared as many as 4,000 doses of reconstituted antibiotics at one time.

Hospitals that prepare single doses of reconstituted and/or diluted antibiotics may encounter numerous problems. These include: selection of the wrong drug, contamination during preparation, improper dosage, incorrect drug concentration, drug deterioration, labeling problems, and incompatible mixtures of drugs or fluids. Moreover, all hospitals experience critical care problems if prepared antibiotic drugs are not available.

Many reconstituted intravenous antibiotics have very short stability periods if maintained at room temperature, or even under refrigeration. In the 1960's and 1970's, research demonstrated that freezing could extend the stability period for most such drugs. Soon after the first research results were published, many hospital pharmacies began developing drug

freezing programs. It was common for hospitals to reconstitute and freeze antibiotics in anticipation of need.

For many years, training programs have been conducted across the United States to teach hospital pharmacists how to develop drug admixture programs. Information on freezing antibiotics has been included in such programs. Virtually every hospital in the United States which has more than 300 beds has a pharmacy which operates an admixture program and many of these programs engage in the freezing of reconstituted antibiotics.

Once freezing programs were developed, drug storage times were extended. The extensions were determined by reference to published literature, the institution's own studies, the manufacturer's labeling, or technical letters from manufacturers. Most hospitals, however, do not possess the facilities to engage in sophisticated analytical testing of these products. In fact, very few of these hospitals conduct stability testing on these frozen reconstituted antibiotics.

Baxter initiated its TRC program in 1982. The concept was that the TRC would perform the same functions as the hospital pharmacy, but more efficiently, more safely, and at a reduced price.

In June 1982, Baxter transmitted a letter to the FDA Chicago District Office describing the TRC process contemplated by Baxter. FDA raised no regulatory concerns or objections to the Baxter program, and the TRC commenced operation in July 1982 at Morton Grove, Illinois.

When the TRC program was commenced, only antibiotics were reconstituted. Baxter purchased antibiotics that had been fully approved by the FDA, and those antibiotics were received in the same form as they were supplied to hospitals. The drugs are accompanied by FDA-approved labeling which includes instructions for reconstitution and/or dilution. Each of the diluents and reconstituting fluids used by Baxter is fully approved by the FDA. Even the director of the FDA Chicago District Office has acknowledged that "the powders and liquids that the TRC currently uses as starting materials are themselves FDA approved finished pharmaceuticals."

Baxter reconstitutes these antibiotics according to the manufacturer's instructions. The antibiotics are reconstituted with a fluid recommended in the manufacturer's FDA-approved labeling. After agitation to assure that the dry powder has dissolved, single doses of the reconstituted drug are aseptically transferred to FDA-approved Viaflex containers filled with an appropriate diluent.

The reconstitution and dilution steps performed by the TRCs are the same as those performed by a hospital. The environment and controls present in the TRC's operations, however, are more sophisticated than those in virtually any hospital or physician's office. In the TRCs, drug preparation occurs in a special environmentally controlled clean room. The room is supplied with filtered air at a pressure above that present in surrounding rooms. This prevents airborne contamination from entering the room from outside sources. Personnel working in the room are attired in special clean room clothing. They have been specifically trained for their work activities. Preparation steps are carried out in vertical laminar flow hoods to further control the environment in which actual drug preparation occurs. They also protect the workers from hazardous drug vapors and spills. Significant process controls are also applied, including the regular testing of sterile media fills to verify aseptic techniques. Essentially, the TRC performs the same function as a hospital pharmacy but on a much larger scale. This process, however, is accompanied by substantial advantages in safety, effectiveness, and reduced cost.

After the antibiotics have been reconstituted, they are frozen in the Viaflex containers. This is in essence the same operation that is performed at the admixture centers of larger hospitals. Baxter has conducted stability studies on each of these frozen antibiotics, and expiration dates are assigned to each product based upon these studies.

The freezing of the antibiotics is specifically mentioned in the package inserts of six of these products. For the other two, Baxter has received letters from the manufacturer which support use of the freezing process. For three of the antibiotics under consideration, ceftazidime, cefuroxime and cefamandole, the manufacturer's package insert specifies both freezing and an expiration date which is consistent with that used on the TRC product. For three other antibiotics, nafcillin, piperacillin, and ticarcillin, the manufacturer's labeling mentions freezing, but the TRC expiration date is somewhat extended based on Baxter's own stability studies. For the remaining two antibiotics, penicillin G and tobramycin, the package insert does not specifically mention freezing. Both the freezing of these products and the extended expiration dates, however, are justified by Baxter's own stability studies. FDA is specifically authorized to review the stability testing and information that has been conducted at Baxter, and has used this authority on several occasions.

In the first seven years that the TRC has reconstituted and shipped these products, it has enjoyed an excellent safety record. During this time period, approximately seven million products have been produced at the TRCs, and there have been only 14 medical complaints. Moreover, none of these complaints have been attributed to the reconstitution and repackaging process at the TRC.

The district judge, Brian Barnett Duff, who granted the preliminary injunction, held that these antibiotics were misbranded pursuant to 21 U.S.C. § 352(f)(1). This conclusion was based solely on the determination that they required new drug approval, and that no such approval had been obtained.

FDA's regulations state that a drug will be exempt from the requirements under § 352(f)(1) relating to adequate directions for use "to the extent to which such an exemption is claimed in an approved application with respect to such drug...."

Because of my opinion that it is inconceivable under the facts and circumstances of this case that the TRC program itself is subject to the new drug procedure requirements, it would follow that Baxter is exempt from the requirements of paragraph 352(f)(1) and accordingly they are not misbranded within the meaning of that section of the statute. It is of interest to note that the FDA was informed of Baxter's intention to commence the TRC program even before it became operational. This was by letter to the district director of FDA in Chicago on June 16, 1982. FDA did not raise any regulatory objection to this program and Baxter began reconstituting drugs in July 1982. FDA investigators conducted inspections at the TRC in June 1983 and June 1985. Neither of these inspections resulted in any expressions of concern by the FDA. Other inspections were conducted but it was not until October 1986 that the FDA issued a Form 483, Inspectional Observations, which is FDA's method of informing the inspected facility of the agency's belief of a violative practice. Even that notice of observation, however, did not raise questions concerning safety or efficacy, nor did it suggest that Baxter's reconstitution and repackaging activities required the submission of a new drug application. Thereafter a series of meetings were held between representatives of Baxter and FDA followed by a seizure complaint filed in May 1987, which was itself replaced a year later by the complaint for injunction in April 1988.

At all times since July 1982 Baxter has engaged in the reconstitution process for the eight antibiotics in question in the manner I have described earlier. The fact that it is still doing so is attributable to stays in which four federal judges have been involved one way or another. Judge Duff issued his order and memorandum opinion granting the preliminary injunction on April 26, 1989. Because apparently 1200 hospitals relied on Baxter for these reconsituted antibiotics and because they could not begin to reconstitute them immediately, Baxter sought a modification of the preliminary injunction to allow continued shipment during a 60–day transition period. Over the FDA's objection, the court stayed the preliminary injunction until May 16,

1989. On that date, the court issued an amended memorandum correcting a misstatement in the original order that antibiotic reconstitution had already been terminated before the preliminary injunction order was issued.

Baxter moved for stay of the injunction pending appeal. In Judge Duff's absence, the motion was initially presented to the designated emergency judge, Marvin E. Aspen, on May 30, 1989. Judge Aspen entered an interim order staying the injunction until June 10, 1989. On June 1, 1989, Judge Duff vacated the interim order and denied Baxter's motion for stay. Baxter then moved in this court for a stay pending appeal, the notice of appeal having been filed on May 23, 1989. This motion was supported by a memorandum totaling 133 pages of which 17 pages were a legal memorandum. While this was pending before this court, the FDA filed an interim response to Baxter's request for a stay consisting of 17 pages objecting to a stay. Two days later the FDA filed a supplemental response consisting of 14 pages, again vigorously opposing the granting of a stay pending an appeal. On June 14, 1989, a three-judge panel consisting of Judges Bauer, Cummings, and Kanne granted Baxter's motion for a stay of the preliminary injunction, which effectively permitted Baxter to continue reconstituting and shipping antibiotics during the pendency of the appeal, which it currently is continuing to do.

I am unable to find any case squarely on point on the issue of whether the TRC's reconstituting process, as I have outlined it earlier, constitutes in itself the creation of a new drug, as that term is used in the Federal Food, Drug, and Cosmetic Act in relation to the entire drug product. I do find, however, support for the position I have taken in its recognition by the United States Supreme Court in *United States v. Generix Drug Corp., et al.,* 460 U.S. 453, 103 S.Ct. 1298, 75 L.Ed.2d 198 (1983). The Court reserved the question of whether two demonstrably bioequivalent products containing the same active ingredients, but different excipients, might under some circumstances be the same drug. 460 U.S. at 460–61, 103 S.Ct. at 1302. Here in the

present case we have only one drug with an active ingredient. Here the excipient is an inert substance used to give the active ingredient, FDA approved, a suitable form for use by hospitals. There is no argument that the active ingredient itself cannot be administered to a patient in its liquid or powder form.

In the case at bar, the TRC products contain the same active and inactive ingredients as the approved product, and are of equal bioavailability and are bioequivalent to those approved products. Thus, it appears to me, the TRC products are the same "drug" as that which the FDA has approved.

The term "bioavailability" is defined in 21 C.F.R. § 320.1(a). The regulation states that bioavailability of a drug means the:

> Rate and extent to which the active drug ingredient or therapeutic moiety is absorbed from a drug product and becomes available at the site of drug action.

This, it appears to me, is the degree to which a drug or other substance becomes available to the target tissue after administration.

In the case at bar, both the TRC products and the products as approved by FDA are intended for intravenous infusion. Because of this route of administration, they are presumed by FDA to be of equal bioavailability. *See* 21 C.F.R. § 320.22(b). Thus, there would seem to be no issue concerning the bioavailability of the TRC products and the FDA-approved products.

In addition, the Code of Federal Regulations also defines the term "bioequivalent." Bioequivalent drugs are those whose rate and extent of absorption do not show a significant difference when administered at the same molar dose of therapeutic moiety under similar experimental conditions. 21 C.F.R. § 320.1(e).

In the case at bar, the TRC label for each of these products does not change the circumstances or type of use of the product. In fact, the TRC label specifically incorporates the instructions and prescription directions in the approved package insert. Thus, the TRC does not change anything

about the product that would affect the rate and extent of absorption, and thus the TRC products are bioequivalent to the products that have already been approved by FDA.

In essence, the TRC products are an example of the products discussed in the *Generix* decision that exhibit equal bioavailability and are bioequivalent to one another and, according to *Generix*, may very well be the same "drug" for purposes of the Act. On the facts of this case, the TRC products are, in my opinion, the same product as the drug purchased. They are not imitations or variations of the eight FDA antibiotics. They are the eight approved antibiotics now ready to be administered to a patient. They are simply brought farther along in their necessary preparation for use than were the drugs formerly. They are not, as the FDA seems to contend, generic drugs.

The characteristics that will be reviewed by FDA to determine whether a drug product has become a "new drug" which requires its own approval under 21 U.S.C. § 355 are described in 21 C.F.R. § 310.3(h)(1)–(5). That regulation states in pertinent part:

(h) The newness of a drug may arise by reason (among other reasons) of: (1) the newness for drug use of any substance which composes such drug, in whole or in part, whether it be an active substance or a menstruum, excipient, carrier, coating, or other component.

(2) The newness for drug use of a combination of two or more substances none of which is a new drug.

(3) The newness for drug use of the proportion of a substance in combination, even though such combination containing such substance and other proportion is not a new drug.

(4) The newness of use of such drug in diagnosing, curing, mitigating, treating, or preventing a disease, or to affect a structure or function of the body, even though such drug is not a new drug when used in another disease, or to affect another structure or function of the body.

(5) The newness of a dosage, or method or duration of administration or application, or other condition of use prescribed, recommended or suggested in the labeling of such drug, even though such drug when used in other dosage, or other method or duration of administration or application or different condition, is not a new drug. (AA 90–91).

Clearly, the freezing or assignment of an expiration date to a drug that has already been approved is not described by this regulation as an event or characteristic which will require a determination that a "new drug" has been created. I can find no support for FDA's position.

The freezing and expiration dating of a drug product are events which are controlled by FDA's extensive regulations concerning compliance with current good manufacturing practices—not by the new drug regulations. The requirement that manufacturers perform and maintain data concerning stability testing is included in 21 C.F.R. § 211.166. This provision and the applicable portions of the Act accord FDA full authority to conduct inspections, review the applicable data, and initiate legal proceedings to compel compliance with current good manufacturing practices if that inspection and review indicates that there has been a serious divergence from the requirements of the regulation. As I have previously stated, Baxter concedes this right of inspection and the agency's right to compel compliance with good manufacturing practices.

In addition, FDA's Compliance Policy Guide for repackaging of drugs indicates that the preparation and retention of stability data is a matter to be controlled under the CGMP regulations. FDA's Compliance Policy Guide, at § 7132.13 states:

Generally, we do not consider the CGMP regulations (21 C.F.R. Parts 210 and 211) to require repackers of finished dosage form drugs to perform analytical testing such as chemical identity tests or assays, or to require receipt of reports of analysis, on a batch-by-batch basis for drug products which are repacked under the following circumstances....

The policy in the Compliance Policy Guide applies to the question of adequate batch-to-batch—testing examination criteria for routine acceptance and release of drug products which are repacked. It does not alter any testing which repackers may be required to perform on drug products from other standpoints, *such as any stability testing required in order to establish appropriate expiration dates in the container-closure system used by the repacker,* testing which may be required to determine the suitability of repacker's drug product containers and closures,....

FDA Compliance Policy Guide, § 7132.13 (emphasis added). Thus, FDA's own regulations concerning repackers clearly indicate that the CGMP regulations are to be used when there is a question concerning stability data and the assignment of expiration dates.

I can conceive of no sound policy argument to support the conclusion that these factors must be controlled by means of the new drug application process. A new drug application, filed under 21 U.S.C. § 355(b)(1), (j)(1) or 357, must contain extensive data and information about a variety of issues. Rather than employ this very extensive, expensive, and protracted procedure to deal specifically with the issues of stability in freezing and expiration dating, FDA is fully justified in utilizing the more specific and limited authority conferred by the CGMP regulations.

The Government seems to take an inconsistent position on exactly what is the issue in this case. It acknowledges on page 34 of its brief that "FDA does not charge that the TRC antibiotics are new drugs," but also includes extensive arguments about why the TRC products are new drugs requiring approval.

I agree with Baxter that these are not new and different products, and therefore no legal or policy need exists to implement the whole regulatory approval process twice for each of these drug products. The TRC products should be exempt from requirements for batch certification and approval because they are the actual approved products. Hence, these products are not, as argued by the Government, misbranded under 21 U.S.C. 352(*l*) because they are the products for which the original manufacturers have been granted exemption as provided for in 21 C.F.R. § 433.1.

It appears to me that the Government's brief placed incorrect reliance on certain statutory provisions and regulations to support its argument that the TRCs are engaged in "manufacturing." Gov't's Brief, pp. 42–43. It cites 21 U.S.C. § 360(a), 21 C.F.R. §§ 207.3(a)(8), 210.3(b)(12), and 21 C.F.R. § 201.1(b)(10). These statutory and regulatory sections, however, do not define "manufacturing" as such. They are all related to matters peripheral to the drug manufacturing process, such as registration of producers, (21 U.S.C. § 360(a); 21 C.F.R. § 207.3(a)(8)) or good manufacturing practices, (21 C.F.R. § 210.3(b)(12)), or labeling (21 C.F.R. § 201.1(b)(10)). None can be considered an authoritative definition, for each is obviously intended for purposes of its specific context only. Ironically, Baxter does not even meet the definition of "manufacturer" in 21 C.F.R. § 201.1(b)(10), because it performs only one of the ten requisite activities listed in that definition. 21 C.F.R. § 201.1(b). Under this regulation, Baxter could not label the TRC products as having been manufactured by Baxter, but in fact, pursuant to this regulation, labels the products "Repackaged by Baxter Healthcare Corporation." Gov't's Brief, p. 42.

It is also my opinion that the district court erred in its opinion by asserting that it owed deference to the FDA on issues of scientific interpretation and application. These are legal issues concerning the legal application of the Federal Food, Drug, and Cosmetic Act and implementing regulations. These are legal issues which are entirely within the province of that, and this, court to decide.

I come away from reviewing this appeal with the unfortunate feeling that we have a case of bureaucratic overreaction to Baxter's declination to engage in a process which it did not deem legally necessary, in which position I fully concur. I do not

intend to denigrate or minimize the importance of the Federal Drug Administration in protecting the interest of the public's safety in the use of drugs necessary in the continuation of good health. The diligence of FDA is testified to obviously by the periodic references in the media to drugs which are being administered in other parts of the world with effectiveness and apparent safety but which have not yet been approved for use in this country. I am putting aside in preparing this dissent any idea that the FDA in this case has succumbed to the necessities of its annual presentation of a budget to preserve, and ordinarily increase, that which Congress gives to it. Such budget requests, of course, are predicated to a considerable extent on justification of personnel needs, and I would be most disappointed in this respected governmental agency if it was devoting itself unnecessarily to an easily found target such as an established pharmaceutical company rather than to fly-by-night generic substitute operators.

I am not unmindful of the disclaimer in the majority opinion that this court has not prejudged the merits of the controversy which will be before the district court after trial. With respect, however, I must observe that the holding on the legal matters involved seems supportive of the legal position taken by the district judge in granting the preliminary injunction and I cannot believe that the able district judge would do otherwise than to apply the same legal principles he did in granting the FDA's motion. If the disclaimer is to be effective, it is my opinion, reached reluctantly, that on remand, if there is no subsequent action in this court, the case should be assigned to a different judge of the district court.